### COMMONWEALTH *vs.* WALTER ALTHAUSE.

Suffolk. March 17, 1910. — November 22, 1910.

Present : KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Pledge. Contract,* Construction. *Practice, Criminal,* Exceptions, Bill of particulars. *Larceny. False Pretenses. Evidence,* To show intent. *Words,* " Use."

An agreement, contained in a note secured by a pledge of negotiable securities, in regard to the power of the pledgee to dispose of the securities before default, is not to be construed to give the pledgee the right to sell the securities and thus to

end the pledge and all the rights of the pledgor in the securities, unless the language to this effect is unequivocal.

A note secured by a pledge of negotiable securities contained the following provision: "It is hereby agreed that the lenders or assigns shall have the right to make such use of the collateral security named herein . . . as they may desire, subject only to their obligation to deliver to the said borrower, or order, collateral of the same amount and kind." *Held,* that the power to make use of the pledged securities was confined to their use as collateral security and gave the pledgee no right to sell them before default. Distinguishing *Ogden* v. *Lathrop,* 65 N. Y. 158.

The defendant in a criminal case has no right of exception to an erroneous instruction of the presiding judge stating a view of the case which the defendant asked the judge to adopt.

At the trial of an indictment for larceny, where a bill of particulars filed by the Commonwealth at the request of the defendant sets forth the facts relied upon by the Commonwealth without any color being added to them by way of a conclusion of law, the Commonwealth is at liberty to make out larceny in any way in which the facts stated show that a larceny was committed, whether it was a larceny at common law, or by embezzlement, or by obtaining property by false pretenses, or under the definition contained in R. L. c. 208, § 26.

The defendant in a criminal case cannot complain of an erroneous instruction of the presiding judge, although it resulted in a mistrial, if the defendant did not object to the instruction at the trial.

The crime of larceny by obtaining property by false pretenses as distinguished from larceny at common law consists in obtaining by a false pretense the title to property and not its mere possession, so that to make out a case of obtaining property by a false pretense it must be shown either that the title was so obtained or that a contract was procured by a false pretense under which the owner of the property passed the title to another.

If the holder of a note secured by a pledge of negotiable securities, which an agreement contained in the note gave him the right to pledge but not the right to sell before default, obtained the pledge and the agreement by means of a false pretense, and afterwards contrary to the terms of the agreement wrongfully sold the pledged property before default, although this is larceny at common law and also is larceny as defined by R. L. c. 208, § 26, it is not larceny through obtaining property by a false pretense.

The fraud of obtaining property by buying it intending not to pay for it is not under the statutes of this Commonwealth the crime of obtaining property by a false pretense which is included in larceny.

At the trial of an indictment for larceny, if there is evidence that the defendant, who had taken certain negotiable securities as a pledge to secure a note which contained an agreement giving the pledgee the right to pledge but not the right to sell before default the securities held as collateral, wrongfully sold the pledged property before default the day after he received it, and if the defendant contends that in selling the pledged securities he acted honestly believing that he had a right to sell them by the terms of the agreement contained in the note, the Commonwealth may show that at the time the pledge was made the defendant represented to the pledgor that the pledged securities would be pledged by the defendant to a certain bank from which they could be procured by the substitution of other collateral on one or two days' notice of intended

payment of the note, this representation by the defendant of his intention as to dealing with the securities, which he sold the next day, being material to show criminal intent on his part.

INDICTMENT, found and returned in the Superior Court for the county of Suffolk on August 7, 1909, charging that "Walter Althause on the fourth day of February in the year of our Lord one thousand nine hundred and nine did steal one negotiable receipt of the value of two thousand dollars, one piece of paper of the value of two thousand dollars, of the property of one Charles A. Powers."

The defendant asked for a bill of particulars, which accordingly was filed by the Commonwealth, and was as follows:

"Now comes the Commonwealth in the above entitled action and in compliance with the defendant's motion therefor files the following bill of particulars:

"On or about the third day of February, 1909, the defendant told one Charles A. Powers that he would loan the said Powers the sum of five hundred dollars ($500) for three (3) months at six (6) per cent interest and take from the said Powers, as collateral security for the payment of such loan, a negotiable receipt of one C. H. Venner for two (2) six (6) per cent. bonds of the Urbana Water Works Company, and the defendant falsely and fraudulently represented to the said Powers that the defendant intended either to keep the said certificate in his possession or to place the same as collateral security with some bank or banking company for a loan to be made by such bank or banking company to the defendant or to the firm or person by whom the defendant was employed. Thereupon, upon the same date, the said Althause loaned to the said Powers the sum of five hundred dollars ($500) and received a note for the said amount, dated February 3, 1909, for three (3) months, at the rate of six (6) per cent. per annum, signed by Charles A. Powers, and the defendant also received as collateral security for the payment of the liability evidenced by said note the said receipt of said C. H. Venner. On or about the third or fourth day of February, 1909, the said Althause sold and delivered the said receipt through the office of Wesley A. Gove & Co., and has never since held any control over the said receipt or retained any title or interest in the said receipt, but parted with title thereto absolutely. There-

after, and after the maturity of the said note, the said Powers made repeated demands upon the said Althause for the return of the said receipt or of a receipt similar in kind and amount to the said receipt, and has made tender of the amount of the note due from the said Powers to the said Althause with interest at six (6) per cent. from the date of the making of the said note, but the said Althause has declined and refused to deliver to the said Powers the said receipt or any receipt of the same amount and kind as the said receipt.

"The said defendant never intended to retain possession of the said receipt or to place the said receipt in any loan to be made to him by a bank or banking company, but at the time of making the aforesaid representation to the said Powers, and at the time of receiving the said receipt from the said Powers, and at the time of the defendant's selling the same, he intended to dispose of the same and to divest himself of all title to the said receipt, and any lien thereon that the said defendant might have."

In the Superior Court the case was tried before *Wait*, J.

Charles A. Powers testified that in February, 1909, he had some dealings with the defendant with reference to a loan in the office of one Adams in the Exchange Building in Boston. He testified as follows : " The very last day of January I went to the office of Mr. Adams and there met Mr. Althause. I asked for Mr. Adams. Mr. Althause replied that Mr. Adams was not in but that perhaps he would do any business that I wanted done for me, as he was authorized to do business. I told him that I wished to obtain a loan of $600, giving as security therefor a receipt for two bonds of the Urbana Water Works of the denomination of $1,000 each. I think he asked me what the bonds were, and I explained to him ; and he asked me where he could find out what they were worth, and if they were active. I told him that if he would call up Brown Brothers, bankers, they would be able to tell him the worth of the bonds, or what the quotation was. I then explained to him that the market value of the bonds was far in excess of what they were being quoted at at that time. They were quoted around fifty, making the two thousand dollars worth about a thousand dollars, according to the quotation. Mr. Althause turned to a second gentleman who

was there, and asked him to call up Brown Brothers on the telephone, which he proceeded to do. In two or three minutes, or perhaps less, he said to me that he could not find out the value then, but that if I would come in again that he would let me know. That was, I think, all that transpired at that interview. I went in, perhaps the next day or the second day after; I can't say which. I saw Mr. Althause then, and he said that he had not found out, and to come in again. I went in again the following morning. I saw Mr. Althause, and he said that he would loan me $500 on the bonds, or on the receipt for the bonds. I asked him if he would not let me have the whole $600, and he said, no, he would not. I asked him if he did not consider the collateral good for it. He said, yes, it was good for it, but he would not let me have it. I told him that I would take the $500. Q. At that time was it at this interview at which you gave your note? A. No, sir.— Q. Was that the end of that interview? A. No, sir. — Q. Was there further conversation between you and Mr. Althause at that interview? A. There was further conversation at that time. — Q. Will you tell us what that conversation was? A. He asked me for how long a time I wanted the loan, and I told him sixty days or thirty days, either one; and he said that he would not consider the matter for either thirty or sixty, nothing less than three months, because the interest on it would not pay him to bother with it; and I told him that I would take the loan for three months. I also told him that the receipt for the bonds was in Worcester and I would have it come down to the National Shawmut Bank the next day with the draft attached, and asked him if he would go down there with me and take it up, and he said that he would, and I made an appointment to come in the following morning about ten o'clock and see him. He said, " Inquire for me when you come in," and I then asked him his name. Up to that time I did not know the gentleman's name. He told me it was Mr. Althause. I went in the following morning and went with him into a little private office, and he sat down at a desk, took out a blank form of note, handed one to me, and he went to filling out another. While he was filling this out I read the form of the note which he handed to me."

The witness testified that at that interview he signed a note

which was produced and introduced in evidence, and was as follows:

" $500.                          Boston, February 3, 1909.

" Three months after date, for value received, I promise to pay to myself or order five hundred dollars, with interest at the rate of 6 per cent. per annum, having deposited as collateral security for payment of this or any other direct or indirect liability or liabilities of ours [mine], due or to become due or that may hereafter be contracted, the following property: $2,000 bonds Urbana Water Works (receipts), with authority to sell and transfer the same, or any collaterals substituted for or added to the above without notice, either at public or private sale or otherwise, at the option of the holder of this obligation on the non-performance of this promise. Said holder applying the net proceeds to the payment of this note, and accounting to me for the surplus, if any; and it is hereby agreed that the lenders or assigns shall have the right to make such use of the collateral security named herein together with any collateral added to or substituted for the same and dividends declared, if any, as they may desire, subject only to their obligation to deliver to the said borrower, or order, collateral of the same amount and kind as that mentioned above, together with any collateral added to or substituted for the same with the amount of dividends, if any, collected during the term of this note upon payment of this obligation at maturity. Should the market value of any security pledged for this loan, in the judgment of the holder or holders hereof, decline, I hereby agree to deposit forthwith on demand (which may be made by a notice sent by mail, or otherwise, to my residence or place of business) additional collateral, so that the market value of the security pledged herewith shall always be at least 20 per cent. more than the amount of this obligation, and failing to deposit forthwith such additional collateral or to keep said 20 per cent. margin good at all times, this note shall be deemed to be due and payable forthwith anything hereinbefore expressed to the contrary notwithstanding, and the holder or holders may immediately sell at public, or private sale, the collateral then held for payment of this or any other liabilities above mentioned and apply the net proceeds, after deducting the

costs and expenses, to pay this, either or any of said liabilities, as said holder may deem proper, and we (I) hereby agree to pay any deficit which may arise because of any loss in the sale of the collateral mentioned herein. Payable at any bank or trust company in Boston.

"Charles A. Powers.

"Notify at 176 Federal street, Room 317.

"Indorse here: Charles A. Powers."

The witness further testified: "Q. At the time you signed that note in this little private office, did you have any conversation with Mr. Althause with reference to any terms or with reference to what use or disposition should be made of the collateral? A. I did." To the admission of this evidence the defendant objected on the ground that it tended to vary or control the terms of the written agreement contained in the note, but the judge admitted the evidence and the defendant excepted. The witness thereupon testified, subject to the defendant's objection and exception, as follows: "Q. Now, if you will go ahead, Mr. Powers, and tell us what conversation you had at the time that this note was given. A. As soon as I had read the form of the note through and Mr. Althause had finished writing in what he wrote, I asked him why he inserted the clause giving them the right to the use of the collateral. I cannot repeat that clause." On being shown the clause, "shall have the right to make use of such collateral named herein," the witness said, "That was the clause." "Mr. Althause said that they had applications for loans greater by far than they had the money personally to supply, and that under that note they collected several minor loans which they had made to their customers into one group. He said that they had collected a number of minor loans which they made to their customers into a group, and they themselves, on this group of loans, obtained a loan from the bank. I asked him what bank they used, or which bank they used, and he said there were several banks. He said, 'We are just now getting a collection of loans to go up to a bank in Haverhill, and your security will be put in that set and go there.' I said, 'Is there any doubt in regard to the security of the collateral?' He said, 'None whatever. We

have a special arrangement with the banks with which we do business whereby we can substitute collateral so that when a man pays his obligation to us, if he will just give us one or two days' time, we will get the collateral for him."

The witness was asked, " Q. I will ask you this question, Mr. Powers. I will ask you whether or not any representations made to you by Mr. Althause in regard to the disposition of the collateral or what would be done with it influenced you in any way in regard to the signing of that note?" To the admission of this evidence the defendant objected. The judge admitted the evidence and the defendant excepted. Witness answered, " They did."

The witness proceeded to testify, subject to the objection and exception of the defendant, as follows: " Q. I will ask you what representations of Mr. Althause influenced you in signing that note? A. The representations that the collateral which I was giving him would be security to me. — Q. Would be security to you? A. Yes. — Q. I ask you if any of the other conversations which you had with regard to this security influenced you? A. All of his statements which tended to show me that my collateral would be secure influenced me."

The witness further testified, " I met Mr. Adams at the National Shawmut Bank by appointment on the same day, either the third or fourth of February. I think on the date of the note. A gentleman was present whom I have since found out was Mr. Barnum. He is here to-day. I obtained my $500 at that time."

The following testimony then was introduced subject to the defendant's exception: " Q. Now, will you tell us all the circumstances of obtaining that $500 and also any conversation had in the presence of Mr. Althause? A. I asked the clerk of the bank to let me see the receipt for examination. He handed it to me. I handed it to — Q. The receipt? A. The receipt for the bonds. — Q. The receipt for the two bonds? A. Yes, sir. I took the receipt and handed it to Mr. Althause, who in turn handed it to Mr. Barnum. Mr. Barnum looked it over and said, ' That is all right '; and Mr. Barnum handed to Mr. Althause $500. — Q. In cash? A. Cash, bills; and Mr. Althause handed the $500 to me. — Q. And Mr. Althause had previously

received the note? A. Mr. Althause had received the note in his office, or Mr. Adams's office, as stated. — Q. And what did you do with the receipt for the two bonds — the Urbana Water Works bonds? A. I handed that to Mr. Althause. Mr. Althause handed it to Mr. Barnum prior to my receiving the $500. — Q. So that the last you saw of it Mr. Barnum had it? A. Yes, sir. — Q. Was there any other conversation that took place at that interview? A. Yes, sir. — Q. You may go ahead. A. As we were going out of the bank I said to Mr. Althause, 'The value of those bonds is far in excess of the figure which is quoted for them. They are an investment of long standing held mainly by banks'; and he said to me, 'In my investigation of their value, I judged that to be the case.'"

The witness further testified, "Early in June I went to Mr. Adams's office and inquired for Mr. Althause. That was some time after three months had run. I didn't find Mr. Althause. The first two or three times I didn't see him. I finally saw him, and I told Mr. Althause that I wanted to pay him the $500 and interest and take up my receipt. He said that that receipt was with other security held by a bank in New York; that they had gotten the loan. That the receipt, together with other collateral, had been deposited as collateral for a note of $7,000 with a bank in New York, and that they had not been able to get the receipt back, but that they thought they would be able to do so in a few days, and that if I would come in within a day or two, they would probably have it. I said I would come for it within a day or two, and did go back. I went several times within a day or two, but didn't find him. I finally found him, and I [he] said that — in reply to a question from me — that he feared that the receipt had been sold by a broker in New York with whom they had put it up as collateral. I asked him if he knew that it had been sold, and he said, no, that he did not, but he thought that it was sold; that they were doing everything in their power to get the receipt, and undoubtedly within a few days would have it for me. I went back. The next time I saw Mr. Adams was on the 7th of July. I took with me one Mr. Baxter, and went in and inquired for Mr. Althause; was shown into his private office, and I there made legal tender of $500 with interest, and asked for my note and my receipt for the bonds. I did not

get them, and have never got them.    I have seen the note since then in the possession of Mr. Althause's attorney, but it has not been in my possession."

It further appeared that the defendant sold the receipt on February 4.  The defendant testified that under the form of note which Powers had signed he understood that he had a right to dispose of the bonds.

At the close of the evidence the defendant asked the judge for seventeen instructions to the jury, of which the judge refused to give the first, sixth, seventh, tenth, eleventh and seventeenth, which were as follows:

1.  The defendant is entitled to a verdict of " Not guilty."

6.  A statement by the defendant that he would or would not use the receipt in a certain manner is not a false pretense within the meaning of the word.

7.  A representation as an inducement to the making of a loan that something thereafter was to be or was not to be done is not a false pretense.

10.  Powers was bound under the terms of his contract in his note to transfer the receipt to the defendant, and, doing what he was legally bound to do, no legal injury was inflicted, and the defendant is entitled to an acquittal.

11.  The act of the defendant in offering to pay the value of the receipt to Powers, when Powers tendered the amount due on the note, must be taken into consideration by the jury in determining Althause's intent to defraud, and unless they are satisfied beyond a reasonable doubt that Althause intended to defraud Powers, he is entitled to an acquittal.

17.  If the jury find that any representation was made, if that misrepresentation was an inducement to the making of the contract and not a part of the contract itself, then the defendant is entitled to an acquittal.

The judge, having refused to give any of these instructions, submitted the case to the jury with other instructions, of which those that are material to the points decided are described in the opinion.

The jury returned a verdict of guilty ; and the defendant alleged exceptions.

*C. W. Rowley*, (*L. Marks* with him,) for the defendant.

*C. F. Choate, Jr.*, by leave of court filed a brief for the defendant.

*A. H. Weed*, for the Commonwealth, submitted a brief.

LORING, J. The defendant contended that under the note held by him signed by Powers he had the right to sell the property held under it as collateral security at any time if he thought it wise to do so. But the presiding judge instructed the jury that the note did not authorize the holder to sell the collateral until the maker of the note was in default under some one of the promises or conditions stated therein. The difference between the two views lies at the foundation of this case and we take it up in the first instance.

The provision to be construed is in these words: " The right to make such use of the collateral security named herein . . . as they may desire, subject only to their obligation to deliver to the said borrower, or order, collateral of the same amount and kind as that mentioned above.".

Were it not for the decision in *Ogden* v. *Lathrop*, 65 N. Y. 158, we should have had no hesitation as to the true construction of this provision. It is doubtless competent for a pledgor and pledgee to agree that securities pledged for the payment of a note (in which the pledgor has the general property and the pledgee a special property or lien for payment of the debt due to him from the pledgor) may be sold by the pledgee and the proceeds used by him (the pledgee) as if he alone had been the owner of the securities, leaving to the pledgor (in whom was the general property in those securities) nothing but the unsecured personal obligation of the pledgee to account to him for the value of the securities at the date of the payment of the note. Such an agreement, if made, is not an incident to a pledge of securities. It is an agreement authorizing the pledgee to end the pledge and all the rights of the pledgor in the securities pledged.

It follows that if it is found in a writing by which securities are pledged it must, to have that effect, be couched in terms which do not admit of doubt, as was the case in the note in question in *Wilson* v. *Hawley*, 158 Mass. 250. For if the provision is found in a writing pledging the securities it should be construed, if that be possible, to be an agreement declaring the terms of the pledge and not an agreement authorizing the pledgee

to end the pledge and all interest of the pledgor in the securities pledged.

It is plain therefore that the " use " authorized in this note should be construed to be a " use " as collateral security unless the provision so construed would be meaningless. But that is far from the fact. It is a matter of common knowledge that, in lending money, banks and bankers require the pledge *en bloc* of the securities put up as collateral. That means that if a lender of money on security wishes to be able to put himself in funds (in connection with the advances made by him) through a re-hypothecation of the securities pledged to him, he must have authority to separate the securities received by him from the debts due to him for which they were respectively pledged. That is a right which he does not have in the absence of an agreement authorizing that to be done. Not only that, but such a use of securities pledged to him as collateral is, in the absence of an agreement authorizing it, a criminal offense. R. L. c. 208, § 71.

Where A borrows of B and pledges to B securities for the repayment of the loan so made, and as part of the agreement authorizes B to pledge those securities *en bloc* with other securities owned by him (B) for money borrowed by him, a use of those securities is authorized which is incidental to the pledge of them and not directly destructive of it. We say not directly destructive of the pledge because it is evident that all the securities pledged *en bloc* might be sold to pay the new debt, and in that way the right of redemption which the original pledgor had might be extinguished.

The provision that the " right to make such use of the collateral security . . . as they may desire " is to be " subject only to their obligation to deliver to the said borrower, or order, collateral of the same amount and kind," does not lead to a different conclusion. The obligation to keep sufficient securities of the same amount and kind on hand in place of the identical securities delivered is one of not uncommon occurrence in the methods of carrying on business which now obtain. Its most common occurrence is in case stocks are carried on margin in a jurisdiction where the stock bought and carried on margin belongs to the customer. See *Richardson* v. *Shaw*, 209 U. S. 365, where the cases are collected.

Ample reason therefore for the provision here in question is found in authorizing the pledgee of the pledged securities to repledge them *en bloc* (as was done in *Wilson* v. *Hawley*, 158 Mass. 250), and such a "use" is a "use" incidental to a pledge and not destructive of it. For these reasons we should not have hesitated to limit the word "use" in this agreement to "use" as collateral security were it not for the case of *Ogden* v. *Lathrop*, 65 N. Y. 158. It was assumed in the opinion in that case, and assumed without argument so far as that opinion goes, that no force could be given to the clause there in question unless a sale was authorized. The clause there in question gave the pledgee "authority to use, transfer or hypothecate" the securities pledged to him. However it may be with those words we cannot believe that when a pledgor gives to the pledgee authority to "use" securities pledged to him he intends to authorize the pledgee to end his (the pledgor's) property in the securities pledged at his (the pledgee's) will, substituting therefor his (the pledgee's) unsecured obligation to account for whatever may be the value of the securities upon payment of the note by the pledgor. For these reasons we are of opinion that the decision in *Ogden* v. *Lathrop*, 65 N. Y. 158, should not be extended to the clause in the note here in question.

The case of *First National Bank of Chicago* v. *Caperton*, 74 Miss. 857, is not an authority for the construction of the note put forward by the prisoner in the case at bar. Where a right to use is given to a mortgagor and the mortgage is a mortgage of the product of a factory or the contents of a store, it would be hard not to construe a right given to the mortgagor to use the mortgaged property to be a right to sell it. But where the right to use is given not to a mortgagor but to a pledgee and the property to be used by the pledgee consists of securities pledged as collateral for a debt due from the pledgor, it is not possible (in our opinion) to construe a right to use to be a right to sell. The other case relied on, *Estes* v. *First National Bank*, 15 Col. App. 526, is a similar decision by an inferior court of Colorado.

We are of opinion therefore that the judge was right in the construction which he put upon the note here in question.

There is another matter lying at the foundation of the case. In that matter we are of opinion that the judge was wrong.

The error, however, is an error of which the defendant cannot complain, for he asked the judge to adopt the view which he adopted. We discuss it, however, to arrive at a correct understanding of the case and because, as we decide later on, the case must go back for a new trial. The matter we now refer to is the view taken by the judge of the bill of particulars. The judge ruled that the Commonwealth had set forth in its bill of particulars the crime of larceny by obtaining property by false pretenses, and that having done so it must prove that kind of larceny. But in our opinion the bill of particulars is a colorless narration of facts. By that we mean that the facts set forth in the bill of particulars as the facts relied upon by the Commonwealth are set forth without any color being added to them by way of a conclusion of law. Under this bill of particulars the Commonwealth was at liberty to make out larceny in any way in which the facts stated show that a larceny was committed, whether it be a common larceny, embezzlement, obtaining property by false pretenses, or larceny as defined by R. L. c. 208, § 26. As to the last see *Commonwealth* v. *King*, 202 Mass. 379.

There is a further point on which in our opinion there was a mistrial, but of which again the defendant cannot complain. In this instance he cannot complain of the error because he did not complain of it at the trial. The crime of larceny by obtaining property by a false pretense consists in obtaining title to property by a false pretense. *Commonwealth* v. *Barry*, 124 Mass. 325. In the case at bar the title to the receipt for the two bonds which Powers parted with when he signed the note here in question never passed to the defendant. Not only that, but the note did not give the defendant any power of selling the receipt for the bonds and so of passing the title to another. That is just what the judge told the jury that the note did not do. In the case at bar a special property in the receipt for the two bonds passed to the defendant as pledgee of them to secure payment of the note signed by Powers. And it could have been found that this special property was procured by a false pretense. But that was immaterial. Powers did not lose his general property in and title to the receipt for the bonds by the defendant's exercising his rights as pledgee. The bonds were not sold by the defendant under his right of property in them as pledgee,

nor were they sold under the special rights given by the note to the holder of it (construing the note as it was in our opinion rightly construed by the presiding judge). To make out a case of obtaining property by a false pretense the title must be obtained by a false pretense or a contract must be procured by a false pretense, under which the other party passes the title to another. In the case at bar the receipt for the bond was sold by the defendant wrongfully without regard to his rights as pledgee.

If the bill of particulars had confined the Commonwealth to proving a larceny through obtaining property by a false pretense, the defendant would have been entitled to a verdict of not guilty as matter of law under the construction of the note adopted by the judge. The only effect which the false pretense had (if there was a false pretense in the case at bar) was upon the possession of the receipt which passed to the defendant by the making of the note. At common law that would have been material because obtaining possession by fraud is a taking within the meaning of that word in the definition of larceny at common law. *Commonwealth* v. *Barry*, 124 Mass. 325. *Commonwealth* v. *Rubin*, 165 Mass. 453. *Commonwealth* v. *Flynn*, 167 Mass. 460. *Commonwealth* v. *King*, 202 Mass. 379. But that is no longer material under R. L. c. 208, § 26. Under that act larceny is made out whenever a person "unlawfully and, with intent to steal or embezzle, converts . . . the money or personal chattel of another, whether such money or personal chattel is or is not in his possession at the time of such conversion."

But there is one error made by the judge which is open to the defendant. By his sixth request the defendant asked the judge to rule that " a statement by the defendant that he would or would not use the receipt in a certain manner is not a false pretense within the meaning of the word," and by his seventh request that " a representation as an inducement to the making of a loan that something thereafter was to be or was not to be done is not a false pretense." The testimony which gave rise to these two requests for rulings was given by Powers and was in these words : " As soon as I had read the form of the note through and Mr. Althause had finished writing in what he wrote, I asked him why he inserted the clause giving them the right to the use

of the collateral. I cannot repeat that clause. On being shown clause, 'shall have the right to make use of such collateral named herein,' the witness said, 'That was the clause.' Mr. Althause said that they had applications for loans greater by far than they had the money personally to supply, and that under that note they collected several minor loans which they had made to their customers into one group. He said that they had collected a number of minor loans which they made to their customers into a group, and they themselves, on this group of loans, obtained a loan from the bank. I asked him what bank they used, or which bank they used, and he said there were several banks. He said, 'We are just now getting a collection of loans to go up to a bank in Haverhill, and your security will be put in that set and go there.' I said, 'Is there any doubt in regard to the security of the collateral?' He said, 'None whatever. We have a special arrangement with the banks with which we do business whereby we can substitute collateral so that when a man pays his obligation to us, if he will just give us one or two days' time, we will get the collateral for him.'" The explanation and the only explanation given by the judge of the difference between a defendant's promise to do a thing in the future and a present intention of a defendant as to the doing of a thing in the future was in these words: " A representation or assurance in regard to a future transaction in the nature of a promise is not a false pretense; that is to say, if I say to you, 'Here, you do a certain thing and then I promise you that some time in the future I will do something else,' it is not a false pretense if I fail to do that thing in the future unless that promise was made to induce you to do the particular thing, and I deliberately intended at that moment not to do it and made it for the purpose of inducing you to do something which you had not determined to do and which you would not have done but for that promise." The defendant " duly excepted to those portions of the charge to the jury which were given relating to the matters contained in the . . . sixth [and] seventh . . . requests."

As a general proposition of law apart from statutes making it a crime to obtain property by a false pretense, it would seem that a man's present intention as to a future act is a fact. *Elgington* v. *Fitzmaurice*, 29 Ch. D. 459. *Swift* v. *Rounds*, 19

R. I. 527. In the first of these two cases (*Edgington* v. *Fitz-maurice*) Bowen, L. J., said, at p. 483: " The state of a man's mind is as much a fact as the state of his digestion." And Chapman, C. J., in *Commonwealth* v. *Walker*, 108 Mass. 309, 312, said: "A man's intention is a matter of fact, and may be proved as such."

There are cases where this proposition has been applied in case of indictments for obtaining property by a false pretense. For example it was so applied in *State* v. *Nichols*, Houst. Cr. Cas. 114. In that case the defendant, to induce the prosecuting witness to lend him money, represented to him that he wanted it to lend with some of his own money to a third person. The jury were told that if this was false it was a false pretense. The doctrine of this and similar decisions is that if in addition to making a promise to repay money borrowed, for example, the defendant procured the loan by a false statement of his present intention as to the purpose for which he wished to secure the loan, it is a false representation of a fact and so a false pretense. There is however a conflict in the authorities on this point. There are cases in which it has been held that in such a case as that before the court in *State* v. *Nichols, ubi supra*, the representation by the defendant of his present intention as to the purpose for which he wished to secure the loan is essentially a promise by the defendant that he will use the money lent in the way then stated and is not a false pretense. See for example *People* v. *Blanchard*, 90 N. Y. 314. The cases on one side and on the other are collected in 19 Cyc. 397, notes 57, 58.

But in the case at bar the presiding judge went beyond any decided case in the explanation which he gave of the difference between the representation of a person's present intention as to a future act and an assurance or promise that the future act shall be done. For the purpose of illustrating the essential difference between the two he put as an example of obtaining property by a false pretense a case which is not obtaining property by a false pretense. In effect he told the jury that if A buys property intending not to pay for it he obtains that property by a false pretense. In that case A makes no representation at all. All that he does is to make a promise, and a promise is not a representation of a fact. It has been sought to make out that in legal

contemplation a promise with an intention not to perform is a false pretense because a promise to do a thing of necessity implies a present intention to do it, and therefore whenever you have a promise coupled with an intent not to perform you have an implied false representation of an intention to do the act which the defendant promised to do and so a false pretense. And this finds some apparent support in *Swift* v. *Rounds*, 19 R. I. 527. In that case it was held that where a defendant buys property intending not to pay for it he is liable in an action of deceit because he impliedly represents that he intends to pay for it by the act of buying. It may be doubted whether the making of a promise implies of necessity in all cases a present intention to perform that promise. Upon that question we do not find it necessary to express an opinion. For however that may be, the fraud of obtaining property by buying it intending not to pay for it is not, as matter of construction of the statute creating it, the crime of obtaining property by a false pretense. At common law obtaining property by a false representation of fact, that is, by a lie, was not a crime. *Commonwealth* v. *Hearsey*, 1 Mass. 137. *Commonwealth* v. *Warren*, 6 Mass. 72. *Commonwealth* v. *Call*, 21 Pick. 515, 520. Obtaining property by false weights or false measures was a gross cheat at common law and punishable criminally as such. By St. 33 Hen. VIII. c. 1, cheating by false tokens was also made a crime. This was the state of the law when St. 30 Geo. II. c. 24, was enacted. That act provided that "all persons who knowingly and designedly, by false pretence or pretences, shall obtain from any person or persons, money, goods, wares or merchandizes, with intent to cheat or defraud any persons of the same" shall be punished, etc. This was enacted in this Commonwealth (in practically the same words) by St. 1815, c. 136. It is evident that the fraud (which by enacting that statute the Legislature intended to make a crime) was obtaining the property of another by a false statement of a fact; and it is equally evident that in enacting it the Legislature did not have in mind the fraud of buying goods not intending to pay for them. Both are frauds but they are not the same fraud. In our opinion it was the former alone which the Legislature had in mind in making it a crime to obtain property by a false pretense.

The decisions in this Commonwealth so far as they go are not in conflict with this view. *Commonwealth* v. *Drew,* 19 Pick. 179, was a case where a depositor had deposited money in .a bank under a fictitious name and finally presented to the bank a check to be cashed after he had drawn out all the money deposited by him and received payment of it. It was held that he could not be convicted under the statute because drawing and presenting the check was not an implied pretense that he had funds in the bank. This conclusion was reached on the ground that "a check, like an order on an individual, is a mere request to pay." But the court added that if a check drawn under those circumstances is passed to a stranger " it would probably be holden to be a false pretense." In *Commonwealth* v. *Eastman,* 1 Cush. 189, three partners were indicted for conspiracy in defrauding persons of their goods of whom they made purchases while they (the defendants) were in failing circumstances. In the opinion in that case it was said, at p. 222, that if the defendants had bought " knowing that they had no funds to pay with," thus appropriating the goods to their own use, in fraud of the sellers, a different case would have been presented from that which was presented to the jury by the charge of the presiding judge. And this court went on to say: " Such a case would show a deceptive contrivance or false pretense. The known inability to pay for the goods would render the act of the party a fraudulent and unlawful one." In determining what effect should be given to this statement it is to be borne in mind that the indictment then before the court was an indictment for conspiracy. And an indictment for conspiracy was an indictment which there was no reason for resorting to if buying property with an intent not to pay for it is obtaining property by a false pretense. See in this connection *People* v. *Wheeler,* 169 N. Y. 487, 494. The cases of *Commonwealth* v. *Walker,* 108 Mass. 309, and *Commonwealth* v. *Drew,* 153 Mass. 588, were indictments under the special statute originally enacted in 1863 (St. 1863, c. 248, § 2) making it a crime to obtain goods with intent to defraud " under false color and pretense of carrying on business, and dealing in the ordinary course of trade."

The fraud of obtaining property of another by buying it with an intent not to pay for it might well be made a crime by the

Legislature.   But it is not the fraud of obtaining property by a false pretense.

We are therefore of opinion that this exception must be sustained.

We have held that the fact in the case at bar (if it was a fact) that Powers was induced to borrow the money and pledge the receipt by the defendant's misrepresentation of an intention on his part to keep it in a bank as collateral for money borrowed by him did not make out a case of obtaining property by a false pretense because Powers was not thereby induced to part with the property in the receipt.   We have also held that although that misrepresentation might bear on the question of possession it is immaterial in that connection because possession is not now material in making out larceny under R. L. c. 208, § 26.   But it does not follow that that fact (if it is a fact in the case at bar) is of no significance.   It is in our opinion significant (if it is a fact), and its true significance lies in its bearing on the defendant's criminal intent.   If the defendant in selling the negotiable receipt the day after he received it from Powers acted honestly under a claim of right he was not guilty of larceny. But on the other hand if he lent the money to Powers to secure possession of the negotiable receipt with a view of feloniously converting it to his own use, and then did feloniously convert it to his own use, he was guilty of larceny.   Whether one or the other of these two was the fact was an issue on which the defendant's representation as to his then present intention of keeping the receipt in bank so that he would be able to return it to Powers on his paying his loan was material.

The entry must be

*Exceptions sustained.*