STATE OF DELAWARE V. BENJAMIN PIERSON.

(*October* 14, 1952.)

LAYTON, J., sitting.

398

*Louis J. Finger*, Deputy Attorney-General, for the State.

*Robert C. Barab* for the Defendant.

Superior Court for New Castle County, Nos. 58, 62, 63, 64, 65 and 66, November Term, 1951.

LAYTON, J.:

A number of indictments for obtaining money by false pretenses were returned against this defendant. In so far as concerns us here, they may be roughly divided into two groups. In the first group, defendant is charged with designing to defraud and cheat six persons by obtaining sums of money from them upon the representation that he was the owner of certain building lots which, in fact, he was not. In the second group, he is charged (a) with designing to defraud and cheat one Harold Clifton by obtaining money from him upon the false representation that he had already commenced construction on his home and that money was needed to continue; and (b) with designing to defraud and cheat Elizabeth Taylor by obtaining money from her upon the false representation that he would immediately build a home for her on a certain lot and that certain building materials were already on the lot for the purpose of commencing construction.

Briefly, the facts are these. Defendant was a contractor and determined to build a development of small homes in Roselle in this County and State. It was a "shoestring" venture. He actually obtained title to a few lots from one Eastburn who owned the land which was to be developed and who also orally agreed to give title to a lot to him or to the purchaser of a home at any time upon the payment of $500. He opened a sales office and placed one Elliott in charge as sales agent. Elliott entered into a number of contracts of sale with purchasers including the prosecuting witnesses in these indictments and in most cases received a down payment of $500. The form of contract was sup-

plied by defendant to Elliott and a typical one is here set forth in full.

## Agreement of Sale

"This Agreement, made this 21 day of May, A.D. 1951 by and between Benjamin F. Pierson, Builder of ——— Hereinafter called the Seller, of the one part, and Jesse Sellers and his wife, Jean Sellers, hereinafter called the Purchaser, of the other part

"Witnesseth: That the Seller agrees to sell, and the Purchaser agrees to buy, all that certain lot of land with buildings thereon erected, briefly described as follows; One six room and bath English bungalow with full basement exactly as sample house on Sylvan and S. Woodward Ave. House to have smooth white stucco. Red shingles on roof. House to have other type picture window. Plastered walls instead of knotty pine in living room. To be located on Lot 175.

"The purchase price thereof is the sum of Ninety Five Hundred Dollars ($9500.00), payable in the following manner; $500.00 with signing of this contract. $1000.00 when construction starts. $8000.00 to be placed by mortgage. If mortgage couldn't be placed thru no fault of buyer, all money will be refunded to same. Five Hundred Dollars to be used as liquidating expense and forfeit.

"Deed shall be delivered to the purchaser, and final settlement completed, on or before October 1, 1951 or as soon as possible weather permitting.

"The title to said property shall be a good, marketable fee simple title, free and clear of liens and encumbrances (except as herein otherwise provided); otherwise the Purchaser may rescind this agreement and recover back all moneys previously paid on account of the purchase price.

"All taxes, water rent, and rental of property shall be prorated as of the date of passing of title.

"Possession of the said lands and premises shall be delivered to the Purchaser on or before———— at Settlement————.

"The Seller agrees to keep adequate fire insurance in force for the benefit of the Purchaser until passing of title.

"In consideration of services rendered, a cash commission of ———— of the purchase price shall be paid by the Seller to ————.

"This agreement shall be binding upon the parties hereto, their heirs, successors, administrators and assigns.

"In Witness Whereof, the parties hereto have hereunto set their hands and seals the day and year first above written. Sealed and delivered in the presence of

_____ A. C. Elliott, jrAgents L.S.

_____ Jesse H. Sellers &

Jean Sellers Purchaser L.S.

The terms of the above agreement are hereby accepted and approved.

_____ *Benjamin F. Pierson Owner L.S.*

———————

May 21, 1951

"Received $500.00 as forfeit money on account of the within contract as purchase money to bind the bargain.

*"A. C. Elliott, Jr. Agents"*

Some houses were completed but the ones in question were never started. Defendant's main defense was rested upon the ground that the reason for the delay and his subsequent financial collapse were due to the long delay in constructing roads and sewers, but it is very clear to me that well before this holdup,

he was so financially embarrassed that he was soliciting and receiving money from potential purchasers without the slightest expectation of being able to build their homes for them. Subsequently the failure of subcontractors to complete roads and sewers together with the demands of disappointed purchasers to start their homes threw defendant into a financial and physical collapse. He left for Florida leaving his affairs in complete confusion. Later, he returned but has never done anything about the houses in question. Various other defenses and the facts applicable thereto will be analyzed hereafter.

### The Clifton Indictment

The State concedes that this indictment falls for failure of proof.

### The Taylor Indictment

The State's case here is founded on a telephone conversation from defendant's agent, Elliott, to Mrs. Taylor during which the former said in substance that they were ready to and would start on her home the following Monday; that some materials were already on the lot but that if she was not willing to make a down payment of $1,800 at that time, they would have to give her lot to another party. On the strength of this information, Mrs. Taylor raised $1,800 but before paying it over she talked to Pierson, the defendant, who, she testified, reaffirmed the conversation with Elliott in all respects and assured her the home would be completed by a certain date. The completion date was of particular importance because Mrs. Taylor had to sell her own home to pay for the new one and could not name a possession date to the purchaser of her old home until Pierson gave her assurance when her new home would be ready for occupancy. With Pierson's assurance, she paid the $1,800. No materials were, in fact, then on the lot and the home was never started. In defense, Elliott substantially denied Mrs. Taylor's version of this affair. Further, he stated that not only did he not misrepresent that concrete blocks were then on her lot but she lived only two blocks from the site of her new home and could easily have

verified this fact. Mrs. Taylor stated that she did not personally inspect the lot because it was overgrown with weeds and full of ticks. Pierson also denies making any such representations as charged.

22 *Am. Jur., False Pretenses*, p. 448, defines the crime of False Pretenses as follows:

"* * * It may be said, however, by way of generalization that the crime of obtaining property by false pretenses involves an express or implied false representation of an existing fact made with intent to defraud, the operation of such representation as a deception inducing a transfer, and the obtaining of something of value by the person committing the fraud to the loss of, or prejudice to, another."

The only misrepresentation of an existing fact in this phase of the case is the statement that building materials, concrete blocks, were already on the lot. After considering the testimony as a whole, there is a reasonable doubt in my mind whether Mrs. Taylor paid her money in reliance upon this fact, if it was a fact. I am fairly well convinced it was the promise to start work immediately and to finish by a given date which moved her to make the payment, not the assurance that materials were then on the lot.

This raises the additional question whether the promise to start work immediately would support the charge of false pretenses. *Am. Jur.,* just quoted from, does not so state and I have found no other text which supports such a proposition. Moreover, numerous authorities follow the general rule of the texts that the false promise or misrepresentation must be as to a past or existing fact, not as to an intention to do something in the future. See 22 *Am. Jur., False Pretenses*, § 14 together with authorities collected in Note 12. *State v. Nichols,* 1 *Houst. Cr. Cas.* 114 (Court of General Sessions, Del.) seems superficially to stand with a small minority of cases to the contrary. The following quotation from that decision will suffice to explain it.

"* * * The only false pretense, however, alleged in this indictment which is sufficient for that purpose, provided it is proved to the satisfaction of the jury, was the first, or the allegation that the defendant falsely represented and pretended to the witness that he was about to loan Pierson $438, and obtained from him one-half of the sum, $219, to make up the amount of the loan he falsely pretended he was about to make to him, and which properly imported that he was then and at that time going to make him the loan stated, and not that he was going to do it at some subsequent period. It was, therefore, if false and fallacious, a pretense of an existing fact, or a present and immediate purpose to loan him the money as stated, and did not fall within the case of a mere promise of future conduct. * * *"

See also 35 *C. J. S., False Pretenses,* §§ 9 and 10.

■ But upon closer examination the reasoning of these cases seems to rest upon the debatable proposition that a promise to repay a loan coupled with a false representation as to the reason for seeking the loan will support a conviction for false pretenses. See discussion in *Commonwealth v. Althause,* 207 *Mass.* 32, 93 *N. E.* 202, 206, 31 *L. R. A., N. S.,* 999. Here I regard the promise to start building the Taylor house the following week as a simple misrepresentation of an intention to do something in the future which distinguishes this case from the Nichols decision. It follows that the Taylor indictment must fall.

This leaves for disposition the six indictments based upon misrepresentation as to the ownership in the sales of lots to Clifton, Taylor, Sellers, Podolak Dean and Cerasari.[1] I have read the testimony of the six prosecuting witnesses in these indictments. All of them gave evidence of having made down payments of $500 or more, upon the strength of defendant's representations that he was the owner of the lots in question. Defendant denies the truth of these statements. First, he states that

---

[1]Clifton and Taylor are the same persons who were allegedly defrauded in the first two indictments above discussed.

Elliott, his agent, did not misrepresent that he was the owner of the lots; secondly, that if he did, it was completely without his authorization; third, that even if the misrepresentations were made and were false the various prosecuting witnesses did not pay over the money in reliance on them and finally, in any event, the misrepresentation was not serious in view of the fact that Eastburn under his agreement was bound to convey title to a lot at any time the purchase price was tendered.

■ The first question to be examined is whether or not the agent, Elliott, actually told one or more of these prospective purchasers that defendant owned the lots. All six so testified and I am convinced that he did. He may not have used the word "own" but I am certain, despite his denials, that he employed language reasonably calculated to convey the impression that Pierson was the owner.

Next, did the defendant authorize the agent Elliott to make these misrepresentations? I can scarcely see how he could deny the fact in view of the contracts of sale which, in all six cases, were signed by him over the word owner. He selected the printed forms and gave them to Elliott. Elliott had the prospective buyers sign them as Pierson must have known he would. In the Sellers indictment, at least, he personally signed the contract as agent. Under such circumstances, and in view of the substantial number of contracts which were executed in this fashion, it taxes credulity for Elliott to say that he did not represent defendant to be the owner of the lots or for defendant to state he never authorized Elliott to make such representations. The fact is, I place little reliance in the testimony of these two persons on this phase of the case.

■ Next, the question remains whether any or all of the six prosecuting witnesses actually made their deposits on the strength of the false representations that defendant owned these lots. After reading the testimony as to five of them, I am not convinced beyond a reasonable doubt that they paid their down deposits on the strength alone of the misrepresentation that de-

fendant was the owner. I believe other considerations were more important. But, in the Sellers indictment, I have decided that this misrepresentation did in fact induce the making of the down payment. I have read the testimony carefully and this, in conjunction with my notes taken at trial, convinces me beyond a reasonable doubt that Sellers sincerely relied upon the representation of ownership when making the down payment.

Finally, I am not impressed with defendant's argument that his representations as to ownership were not, in fact, misrepresentations in view of his ability to get title to a lot from Eastburn at any time upon the payment of $500. I do not believe from the evidence as a whole that Pierson's financial position was such as to permit the conclusion that he would ever have been able to pay Eastburn for the lots. Moreover, the agreement on Eastburn's part was oral. It had no binding force. He could have changed his mind at any time. His death, or death of others of his family who had an interest in the land, might have rendered it impossible to make good a transfer because of estate problems. For these and many other reasons this theory of defense is without merit.

I find the defendant, Pierson, guilty as charged in indictment number 66 and not guilty as to the remaining charges.