W. G. Mullican

*v.*

State of Tennessee.

360 S.W.2d 35.

(*Nashville,* December Term, 1961.)

Opinion filed September 7, 1962.

506

FLATT & FLATT, Cookeville, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, THOMAS E. Fox, Assistant Attorney General, Nashville, for the State.

Mr. Justice Burnett delivered the opinion of the Court.

The plaintiff in error was convicted on two separate indictments charging false pretense. He was sentenced to serve three (3) years in the State penitentiary in each case. These sentences were orderd to run concurrently.

There are numerous assignments of error, all of which are to the effect that the evidence preponderates against the verdict and in favor of the innocence of the accused, on the theory that no false representations of the existing facts were shown and no representation that the proposed development by the plaintiff in error about which the charge is made was to be completed within any particular time.

The factual situation developed by this record is that Mullican represented himself to numerous people and in particular to Charles Ramsey and Ralph E. Kidd that he was planning a Fly-In Report on property which he owned bordering on Center Hill Lake. He presented to them "sketches and designs" to show graphicly the type of development that he intended.

Kidd had formerly been a security salesman and lived near this neighborhood and was a member of the same church that Mullican belonged to. The two became acquainted and this development was gone over with Kidd on numerous occasions, and Kidd took Mullican around to various members of the church in this section of Tennessee and over into Kentucky. Mullican had acquired a tract of 120 odd acres, bordering on Center Hill Lake, but the deed to this property, at the time the allegations

against Mullican were made, had not been recorded. Mullican in 1957 had about 20 acres of this land bulldozed apparently getting it ready for a flying field. In his sales talk, or conversation, with Kidd he had made a rather beautiful or attractive picture out of what he intended to develop so that the airplanes would fly in and gasoline and various and sundry things would be sold that people around a fishing resort buy. This association and talk by Kidd with Mullican had convinced Kidd of the advantages that it would have and apparently the money that it would make. As a result of this Kidd introduced Mullican to one, Charles Ramsey.

In a conversation with Ramsey, Mullican represented to him that the site of the project was being developed at that time and that bulldozer work was also going on at the time, according to Ramsey's testimony. This testimony though as to the fact that it was going on at that time was very much weakened in the statements immediately preceding and following to the effect that he, Ramsey, knew Kidd and more or less entered into the arrangement with Mullican on Kidd's recommendation. Ramsey as a result of these representations by Mullican gave Mullican $300.00. He doesn't remember whether it was by check or cash, but this is immaterial. At the time this money was given to Mullican he gave Ramsey and his wife a receipt for $300.00 and a note payable two years after date with six (6%) per cent interest. It was the further understanding that the project would be incorporated and that Ramsey would have an opportunity to buy shares of stock in the corporation with his $300.00 and any interest that it might have earned. All money was to be deposited in a bank at McMinnville until suffi-

cient money was raised and then work on the project would begin.

Another witness testifies that the bulldozing work was done in the fall of 1957, while the time of Ramsey's conversation with Mullican was in March, 1958, and the proof does not show that there was any bulldozing work going on at the time of this conversation.

Similarly representations were made to Kidd, who as heretofore said had been acquainted with Mullican a long time before and had been over various parts of the State around Center Hill and into Kentucky with Mullican. Kidd testifies that he knew the site and had been over it and felt that under the circumstances it was a good proposition. Anyhow as a result of these conversations Kidd let Mullican have $500.00 and was given a note and receipt very similar to that given Ramsey, with similar representations and promises that he would be given an opportunity to buy stock with this money. According to this witness, Kidd, Mullican represented to him that about 20 acres of the project had been cleared by a bulldozer, and the only reason work had been stopped was because people began to speculate about the development, and he stopped it because he feared that the price of adjacent land would become so high that additional purchases could not be made at a later time.

Others made similar advances of money to Mullican in similar transactions as above detailed, but it isn't claimed by the State that there were any promises made which would bring their transactions under the false pretense statute. These payments of Ramsey and Kidd to Mullican upon the conviction was sustained and upon

which the State seeks to affirm the conviction were made in the spring of 1958. After this time no further work was done on the project and as a result of this and the money not being made available, and no explanation made to Kidd and Ramsey the indictments were secured about the time the two years had run out on the notes that Millican had given them. In the meantime they had contacted Mullican and apparently had had to hunt for him for a good while, but for one reason or another nothing was done. After the money was not paid the indictments were secured. On cross-examination it is shown that after the indictments were secured the money was put in trust in the bank to pay these notes. This fact though isn't of any value as far as the legal consequences of the preceding acts were concerned, because the repayment of a loan obtained by false pretenses does not exonerate the deceiver from criminal prosecution. *Ownbey v. State,* 194 Tenn. 500, 253 S.W.2d 726; Annotation, 24 A.L.R., 397; 52 A.L.R., 1167; Ann.Cas., 1916C, 1159.

These indictments are based upon the violation of sec. 39-1901, T.C.A., which reads, as follows:

*"False pretense.*—Any person, who, by any false pretense, or by any false token or counterfeit letter, with intent to defraud another, obtains from any person any personal property, or the signature of any person to any written instrument, the false making of which is forgery, shall, on conviction, be punished as in case of larceny.

"The words 'false pretense' include all cases of pretended buying, borrowing, or hiring, bailment or deposit, and all cases of pretended ownership, where the

person obtaining possession intended, at the time he received the property, feloniously to steal the same."

■ At common law obtaining money by false representation of a fact was not a crime. *Commonwealth v. Althause,* 207 Mass. 32, 93 N.E. 202, 31 L.R.A.,N.S., 999. This being true, many States, including ours, as above indicated by the quoted statute, early passed statutes for the purpose of preventing perpetration of flagrant frauds, and these statutes have been denominated, and are denominated as ours is, as a false pretense statute. In construing these statutes their construction must be strict and nothing which is not within the plain words of the statute will be given meaning against a defendant, but there will be a liberal construction in favor of the defendant.

■ It is also well recognized that under these statutes the false representation made must be representation of a past or existing fact, whether it be by oral or written words or conduct, which is calculated to deceive, or intended to deceive, and does as a matter of fact deceive; and by means of which, by doing these things, the person who does it obtains something of value from the person injured without proper compensation. *State v. Higgins,* 148 Tenn. 609, 256 S.W. 875; *Canter v. State,* 75 Tenn. 349.

■ It seems to us that under this statute the intent to defraud is the gravamen or an essential element in the crime. Of course, to establish this intent some material facts are essential and whether or not there was such an intent is a question for the jury. *Rothschild v. State,* 81 Tenn. 294; *Carter v. State,* supra; and others.

In other words, what we have really been trying to say is that the material part of the pretense made must have been false and made to defraud and induced the party sought to be wronged to part with his property and be a fact then existing or having existed in the past and not one which will take place in the future.

■ Under this record it seems to us that these representations of Mullican relative to this project were done with the intent to defraud both of the State's major witnesses, Ramsey and Kidd, and that these statements to them by Mullican and what he showed them were made probably, and it would clearly follow, with the idea of defrauding the parties out of their money. But, the question is, were these statements made of an existing or past fact to such an extent that a crime has been committed under the statute heretofore quoted? In answer to this question the State pitches its case on two factual developments herein, that is, that Ramsey relied upon the fact that bulldozer work was being done at the time the money was secured from him, which as a matter of fact was not true; and that Kidd made his loan on the representation that the bulldozer work had been discontinued because of the fear that adjacent land would go so high it would not permit future purchases. These are the only two things upon which there is any contention by the State that it can hang its case.

■ When we come to consider the entire record, it clearly appears to us that neither of these representations was sufficient to base a conviction under this statute. In the first instance, Ramsey, when he makes this statement, as a matter of fact says that his making the loan was purely on Kidd's advice, or on the confidence

that he had in Kidd. The loan was not made on the representation that bulldozer work was then going on. When we come to Kidd's testimony, it is shown that Kidd knew all about the lay-out of the project, had been over it and traveled all around everywhere with Mullican trying to interest various people in the church and others in this project. Thus it is, the representation to Kidd that the bulldozer work was stopped because of possible increase in land prices was not such a representation in view of the factual situation, as above detailed, that would bring the case within the requirements as heretofore set forth for a conviction under this statute.

After a careful study of the matter, we are convinced that the proof does not sustain the conviction, therefore the judgment is reversed and the suits dismissed.

FELTS and DYER, JUSTICES, concur.

WHITE, JUSTICE, and TOMLINSON, JUSTICE (Ret.), did not participate herein.