CARLOS WARFIELD & others *vs.* A. D. F. ADAMS & others.

· Suffolk. December 9, 10, 1912. — September 16, 1913.

Present: HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Pledge. Equity Pleading and Practice,* Exceptions to master's report, Recommitting master's report, Decree. *Equity Jurisdiction,* Conspiracy, Coming into court with clean hands, Plaintiff seeking equity must do equity.

In the absence of a special agreement to that effect, a pledgee of securities has no right to pledge the securities to a third person as collateral security for a loan to himself, and if a third person to whom such securities are pledged by the pledgee has notice that the person who pledged them to him held them as pledgee, he is put on inquiry to ascertain whether such pledgee had authority to repledge the securities.

Where a person, to whom securities were pledged by one who held them as pledgee, knew of the previous pledge and thus was put upon inquiry as to the pledgee's right to repledge the securities, and, if he had seen the note secured by the first pledge, would have discovered that such note bore interest at the rate of six per cent per annum while the note secured by the repledging to him bore interest at the rate of two or five per cent a month, and thus might have been charged with knowledge of bad faith on the part of the first pledgee in making the second pledge, it was *held,* that the second pledgee had a right to pursue the inquiry into the authority of the first pledgee to repledge by other means than the inspection of the note, and, if by such inquiry honestly conducted he learned that the right to repledge existed and gained no knowledge as to the bad faith of the first pledgee, he was not chargeable with such knowledge.

Where a suit in equity is referred to a master to hear and determine the merits of all the issues raised by the pleadings and to report to the court his findings of fact, his rulings of law and so much of the testimony as in his opinion may be necessary to a proper understanding of his rulings of law, a party has no right,

by requesting certain findings of fact, to compel the master to adopt such findings or to give a reason for not adopting them.

Where a note secured by a pledge of securities contains a clause giving the pledgee the right to repledge the securities pledged to him, although not the right to sell them except in case of default, the authority to pledge the securities is confined to the original pledgee.

In a suit in equity against a number of defendants, where the bill alleges a conspiracy to defraud the plaintiff to which all of the defendants were parties, if the conspiracy alleged is proved to have existed among some of the defendants but not all of them, those against whom the conspiracy is proved may be held liable.

Where, in a suit in equity against a number of defendants, which was referred to a master under a rule requiring him to report his findings of fact and his rulings of law, it appears by the master's report that he gave certain erroneous rulings to the effect that the bill could not be maintained against one of the defendants for taking part in a conspiracy to defraud the plaintiff unless all of the defendants joined in the conspiracy, if it also appears by the report that on the facts found by the master wholly apart from these rulings the bill cannot be maintained against any of the defendants, the plaintiff has not been prejudiced by the erroneous rulings and his exceptions to the master's report based upon them must be overruled.

The ordinary rule here was applied, that the denial in a suit in equity of a motion to recommit a master's report is within the discretionary power of the trial judge, and in the present case no reason appeared for doubting that this discretion was exercised properly.

Where on an appeal from a decree in equity dismissing a bill against a number of defendants, in which the plaintiff's principal claim against the defendants was not established, it appeared from the facts in the master's report that the plaintiff had the right to redeem certain securities in the hands of some of the defendants, but, although there was no express disclaimer on the plaintiff's part as to this relief, there were indications in the master's report that the plaintiff did not ask for such redemption, it was *held* that the decree dismissing the bill would not be reversed on this ground unless the plaintiff moved for the reversal.

In a suit in equity by the pledgor of certain securities against the pledgee and other defendants, alleging that the securities were obtained from the plaintiff by a fraudulent conspiracy of all the defendants for the purpose of their unlawful use by the defendant pledgee in which the other defendants were alleged to have shared, if it appears that the plaintiff by causing apparent sales to be made had created a fictitious market value for the securities which he pledged to the defendant pledgee, and the greater part of which that defendant pledged to the other defendants, although these facts may give rise to a claim against the plaintiff for fraud and perhaps would have afforded ground for a rescission, they do not constitute such an unlawful inducement of the wrongful acts complained of that the court will refuse to entertain the plaintiff's suit; nor do these facts prevent the plaintiff from maintaining his bill on the doctrine that he who seeks equity must do equity.

LORING, J.   This consolidated cause was begun by three bills in equity which as amended are brought by or in behalf of one Heinze, primarily to redeem certain securities pledged by Heinze as collateral for ten promissory notes in the aggregate sum of $300,000.

These notes were dated between November 20, 1908, and April 5, 1909. Two of them were renewed at maturity, and with a possible exception of one note (about which there seems to be some doubt on the master's report) none were due when these bills were filed on June 29, October 13, and November 15, 1909.

The allegations of the three bills are much the same. It is alleged in them that at the time of making the loans Adams was insolvent and procured the pledge of the securities here in question for the fraudulent purpose of converting them to his own use. Joined with Adams as co-defendants are thirteen individuals, firms or corporations who furnished Adams with the $300,000 (or some of it) which was lent by him to Heinze, and who, it is alleged, conspired with Adams to carry the above fraud into effect and to share in the plunder. The secondary relief sought by the bills is for an accounting for the profits obtained by the defendants through the fraudulent conspiracies with Adams.

The case was sent to a master * to hear and determine the merits on all the issues raised by the pleadings and to report to the court his findings of facts, his rulings of law and so much of the testimony as in his opinion might be necessary to a proper understanding of his rulings of law. The master's report was confirmed and a decree was entered† dismissing the bill with costs as against all the defendants except Adams, and as against Adams the bill was dismissed without costs and without prejudice, the plaintiffs' counsel having told the master that in view of Adams's bankruptcy they did not care for a statement of the account against him.

The suit is here on an appeal taken by the plaintiffs from that decree.

It will not be necessary to state at length all the facts found by the master. For the purpose of deciding the questions raised by the plaintiffs' appeal the following are the facts which we deem material: Heinze was a large operator, particularly in mining stocks, and had promoted and "financed" the Davis-Daly Copper Company, the United Copper Company and the Ohio Copper Company. He managed and controlled these companies, and with his associates he owned their capital stock and bonds. The companies were known on the street as "Heinze companies," and

---

* F. Rockwood Hall, Esquire.          † By order of *Hammond*, J.

their securities as "Heinze securities." The stocks of all three were "non-dividend-paying curb stocks." In the autumn of 1908 and winter of 1909 Heinze had need of large sums of money for his various enterprises. Before that time he had been borrowing money in various parts of the United States and sometimes had had to pay interest at the rate of from two to five per cent per month, and in one instance at a still higher rate. His credit had been greatly impaired.

Under these circumstances, wishing to borrow $50,000 on stock of the United Copper Company and of the Davis-Daly Company, he applied to a New York note broker, Dresser by name, for his assistance. Dresser suggested to Heinze that he apply to the defendant Adams to see if he "could negotiate such a loan." Adams was known by Dresser, but not by Heinze. He had come from New York to Boston in 1906, without capital, and had conducted the business of lending and borrowing money on collateral. In addition he bought and sold some stocks in a small way. In October, 1909, "he went into bankruptcy." The master goes into a detailed statement of the business methods employed by Adams in his three years' business career in Boston. He states his methods before the first of the loans which he made to Heinze and then states that they remained the same during the ten Heinze loans. The money which Adams lent to his customers was obtained by him from others including the co-defendants, by repledging the securities pledged with him, and by paying for the money borrowed by him interest which "averaged from two to five per cent a month on monthly loans and renewals, and somewhat more than that on loans and renewals for a shorter time," in a few instances paying two per cent a week and one per cent a day.

In lending money Adams used a form of note substantially like that passed upon by this court in *Commonwealth* v. *Althause*, 207 Mass. 32. The clause in Adams's note was in these words: "In consideration of the loan hereby made the borrower agrees that the holder or holders of this obligation shall have the right to make use of the collateral security herein named as they may desire, subject only to their obligation to deliver to said borrower collateral of the same amount and kind as that mentioned above upon the payment of this note at maturity." In borrowing money, however, Adams used an ordinary collateral note which gave the holder a

right to sell the collateral on breach of the agreements contained in the note, but not otherwise.

Adams lent Heinze $300,000 on the following ten notes secured by the following collateral:

| Date | Amount | Time | | Collateral |
|------|--------|------|--|------------|
| **1908** | | | | |
| Nov. 20, | $50,000 | 6 mos. | 15,000 shares | Davis-Daly Copper Co. |
| | | | 3,000 " | United Copper Co. |
| Dec. 11, | 50,000 | 6 mos. | 15,000 " | Davis-Daly Copper Co. |
| | | | 3,000 " | United Copper Co. |
| **1909** | | | | |
| Jan. 28, | $10,000 | 3 mos. | 5,000 " | Ohio Copper Co. |
| Feb. 3, | 15,000 | 1 year | $30,000 bonds | " " " |
| " 10, | 25,000 | 1 year | 50,000 " | " " " |
| " 19, | 25,000 | 1 year | 50,000 " | " " " |
| " 24, | 30,000 | 1 year | 45,000 " | " " " |
| | | | 2,500 shares | " " " |
| Mar. 5, | 50,000 | 1 year | $50,000 bonds | " " " |
| | | | 8,500 shares | " " " |
| " 25, | 20,000 | 6 mos. | 6,500 " | " " " |
| Apr. 5, | 25,000 | 1 year | 5,000 " | " " " |
| | | | 2,000 " | United Copper Co. |

The first two notes were signed by Heinze, the next seven by Warfield and the last one by Joyce. The first two were renewed at maturity for six months, and "with these two exceptions none of the plaintiff's loans were renewed." It follows that no notes were due when these bills in equity were filed unless it was the third note. If that was a note for three months it was two months overdue when the bills were filed. But throughout the report it seems to have been assumed that no notes were overdue at that time.

The ten promissory notes given by Heinze, Warfield and Joyce bore interest at six per cent per annum. On the first two notes Adams was paid in addition a commission of two per cent. But on the other eight he was not paid, nor was he entitled to receive, anything beyond interest at six per cent per annum.

In addition to the general statement that all the money lent by Adams to Heinze was borrowed from the co-defendants in these suits and from others who did a similar business of lending money at from two to five per cent a month, the master stated at length

from whom Adams procured the $300,000 lent to Heinze. From this it appeared that by borrowing at the high rates of interest paid by him, Adams succeeded in not having to use by way of re-hypothecation all the securities pledged to him by Heinze. The securities thus freed Adams used as collateral for money borrowed by him for his own use, or sold them, using the proceeds in the same way. The final finding of the master on Adams's intent is in these words:

"At the time of the first Heinze loan Adams was practically insolvent, and his creditors were clamoring for their money or securities. His purpose and intention in making this and the other nine loans was to thereby get possession of the collateral named in the notes, and, after using so much of it as might be necessary to raise the amount called for by the plaintiff's notes, to use the rest of it to get money to relieve his own financial distress and generally to use in his business, intending to return it if possible upon payment of the notes, and trusting to the future to enable him to do so, or, perhaps, through a break in the market and the consequent impairment of the twenty per cent margin stated in the plaintiff's notes or otherwise, to relieve him entirely from the necessity of so doing. He knew that the only way he could make money out of these transactions was by selling the pledged securities in the market, and buying them in at a much less price when the notes matured. It was a desperate chance, but he took it. He got large sums (in excess of the amounts he loaned the plaintiff) by loans on and sales of the plaintiff's collateral from time to time. These sums went into his general funds, and were used by him in paying interest and carrying charges on the loans he got from his co-defendants and others on the plaintiff's collateral, in making loans to others, in paying importunate creditors, in meeting his personal expenses, and generally in the conduct of his business."

As to the thirteen co-defendants the master made the following findings: "None of Adams's co-defendants were aware of his financial condition or aforesaid purpose and intention at the time of the first Heinze loan, nor thereafter during the first six months of 1909, nor had they reasonable cause to suspect it. He kept up the same appearance of prosperity as before, carrying about with him bank bills of large denominations and checks of large amounts, which he displayed ostentatiously from time to time, and boasting of his

successful business. . . . He moved into a larger and more impos-
ing suite of offices, with an increased office force, maintained an
automobile and chauffeur, and in general gave the impression
that he was financially prosperous." "I find that Adams' several
co-defendants, subject to the modifications below as to Gale and
Gould, and with the exception of Gove and C. P. George, knew or
had reasonable cause to believe that the 'Heinze Securities' which
Adams was pledging with or selling through them was collateral
which had been pledged by the plaintiff with Adams as security
for loans; that, as hereinbefore stated, they were all, without ex-
ception, familiar with the form of note which Adams used in making
loans to customers, and believed that by its terms Adams had the
right to divide the collateral, and re-hypothecate, or even to sell
it, subject only to his obligation to deliver to the borrower col-
lateral of the same amount and kind upon the payment of the
note at maturity; that with the above exception as to Gove and
C. P. George, and subject to the modification below as to Gale and
Gould, they assumed, and under the circumstances were justified in
assuming, that the plaintiff's notes to Adams, of whose terms,
they were, however, ignorant, gave the same rights, and that
under their terms Adams had a right to do with the collateral as
he did. . . . Gale understood that the D. D., U. C., and Ohio
companies were Heinze properties; knew that moneys loaned by
him to Adams on the Heinze securities were sent over to New
York; and had personal knowledge that Heinze was borrowing
money on such securities in at least one instance in the name and
on a note signed by another party, as well as in his own name.
They both had information that Heinze was attempting, through
Dresser and others, to borrow in the name of and through other
parties, as well as in his own name, on Heinze securities in Boston.
They neither of them assumed or considered whether the agreement
between Adams and Heinze with reference to the use of these se-
curities was expressed in the form of a note or in the form of some
other contract, or whether the language of such note or contract
was identical in phraseology with that contained in the notes which
Adams used in loaning to other persons during the first period
spoken of in this report. They both believed, and had reasonable
cause to believe, that the pledges to them by Adams of said securi-
ties were fully authorized by Heinze, and they believed (although

erroneously) that Adams was borrowing of them for Heinze, and as his agent, on the securities in question. . . . Gove had no knowledge and no cause to believe that any of the certificates of 'Heinze Securities' involved in this suit which were delivered to his office for sale were held by Adams as collateral for loans to anybody; that they got into Adams's possession improperly; or that he was making any improper or unauthorized use of them. C. P. George never heard of the plaintiff in connection with these transactions, and knew nothing of his notes to Adams. He believed that a part at least of the stocks and bonds which Adams pledged with him to secure his (George's) loans to Adams were stocks and bonds held by Adams as collateral for loans, and that, by the terms of the notes representing the same, Adams had a right to use the collateral as he did."

All loans made to Adams by the co-defendants and others were paid at the date of the filing of these bills, and all the plaintiffs' securities had been sold and disposed of except that one hundred and nine Ohio Copper Company's bonds were held by some of the co-defendants and fifty-one Ohio bonds by persons other than the co-defendants, to secure loans made by them to Adams.

The master summed up his findings in these words: "My conclusions are, and I find on all the evidence in the case: 1. That when they were given the plaintiff intended to pay at maturity the ten notes referred to in the bills, given by himself, Warfield, and Joyce to Adams, and to redeem the collateral deposited to secure the same. 2. That Adams did not make these ten loans, and procure the collateral given to secure the same, in good faith, but with a fraudulent intent. 3. That throughout their various dealings involving the plaintiff's collateral Adams's co-defendants acted, not in collusion with him or each other as alleged, but in good faith, without notice, knowledge, or information of any fraudulent intent on his part, or of any fraud practised or attempted by him upon either Heinze, Warfield, or Joyce, or that he was making any unauthorized use of the plaintiff's collateral."

The finding of bad faith on the part of Adams was amply justified by the facts found by the master. Were it important, further details could be stated which would demonstrate the correctness of this finding. But as Adams took no appeal from the decree it is not necessary to consider it so far as he is concerned. And in the

view which we take of the case against the other defendants it is not necessary to go into the correctness of this finding so far as they are concerned.

So far as the main allegations of the bill go the master has found that the co-defendants did not in fact conspire with Adams to rob Heinze. The evidence before the master is not before us. On the facts found by him we see no reason for disturbing this finding of fact. In that connection the master made this finding: "I find that, considering the time of the loans and the nature of the collateral, the sums paid by Adams therefor as above were not extortionate nor unreasonably large, and (if material) that they were the usual and current rates at the time on loans of that kind." The evidence on which this finding was made is not before us, and we cannot say that it was wrong.

We take up first the question of the liability of the defendants who lent money to Adams knowing or believing that the securities given by him to them as collateral were "collateral which had been pledged by the plaintiff with Adams as security for loans" made by him to Heinze.

If these co-defendants are liable on the findings made by the master, they are liable because they were put on inquiry. And if they were put on inquiry it is of no consequence whether the securities taken by them were or were not negotiable securities. In that connection it is of no consequence what they believed were the terms of the notes on which Adams lent money to Heinze, nor what counsel had advised them was the true construction of those notes. The advice given them by counsel and their belief in that connection were of importance on the question of their having been privy to the fraud committed by Adams. But in connection with their liability on the ground that they were put on inquiry those facts are not of consequence.

It nowhere appears that the co-defendants knew that Adams was lending to Heinze at six per cent per annum the money which he was borrowing of them at from two to five per cent per month. Had they known that, it would have been hard to believe that they did not know of his *mala fides* or to hold that they were not put on inquiry as to it.

But these co-defendants (with the exception of Gove and C. P. George) knew that the securities pledged by Adams for money

lent by them to him were securities pledged by Heinze to Adams for money lent by Adams to him, or to Warfield and Joyce for his benefit. A pledgee has no right to separate collateral from the debt for which it is pledged and to re-hypothecate it for a new loan made to him by a third person. A pledgee (in the absence of a special agreement) is bound to hold the collateral pledged to him as security for the debt for which it was pledged so that the pledgor can redeem his property at any time by paying the debt for which it is security. Consequently when it came to the knowledge of these defendants that the securities given by Adams to them as collateral for money lent by them to Adams were securities held by Adams as collateral for money lent by him to Heinze, they were put on inquiry to ascertain whether Adams had authority to separate Heinze's securities from Heinze's notes and to re-hypothecate them for loans made by them to him, Adams. If they had made that inquiry they would have found that Adams, so long as he acted *bona fide,* did have that authority. It is not plain whether the construction of these ten notes is to be governed by the law of Massachusetts or by the law of New York. The first two were dated in New York and were delivered in Massachusetts, while the other eight were dated in Boston and delivered in New York. So far as the case tried before the master was concerned it was not necessary to decide which of the two States was to be looked to on the question of construction. By the law of Massachusetts as well as of New York, these notes gave the holder authority to re-hypothecate the collateral held by him as pledgee. The decision in *Ogden* v. *Lathrop,* 65 N. Y. 158, was put in evidence to prove the law in New York. Although the question there decided was the holder's right to sell under a note not altogether like the ten notes here in question, we are satisfied that these notes, construed as New York contracts, give the holder a right to re-hypothecate the collateral. And so far as Massachusetts is concerned the opinion in *Commonwealth* v. *Althause,* 207 Mass. 32, is decisive upon that point. It was held in *Commonwealth* v. *Althause* that a note in the form of those given in the case at bar by Heinze, or in his behalf by Warfield and Joyce, does not give the holder a right to sell the collateral if the maker of the note is not in default. This conclusion was reached on the ground that the clause authorizing the holder of the note to make "use" of the

collateral must be taken to have been inserted to enable him to separate the collateral from the note and pledge it alone or mingled with other securities *en bloc* as collateral for money lent to him. Adams had no right to re-hypothecate Heinze's collateral as he did in these suits. But that was because he acted *mala fide*, not because his authority was not sufficient for similar acts of re-hypothecation done *bona fide*.

As we have said, if these defendants had known that Adams was lending to Heinze at six per cent per annum and borrowing the money so lent at an average of from two to five per cent a month, that fact in our opinion would have been notice of Adams's bad faith. On the findings made by the master the defendants were put on inquiry as to Adams's authority to re-hypothecate but not as to his bad faith. If in pursuing the inquiry as to his authority to re-hypothecate they necessarily would have learned of his bad faith, it may be assumed that they are chargeable with knowledge of it although not put on inquiry as to it. The question therefore comes to this: Were these defendants, in pursuing the inquiry as to Adams's power to re-hypothecate Heinze's securities, bound to see Heinze's notes held by Adams? If they were, it may be that they are chargeable with knowledge of Adams's bad faith, for in that case they would have learned that he was lending Heinze at six per cent per annum the money which he was borrowing of them at from two to five per cent a month. But if they were justified in pursuing the inquiry (which they were bound to make as to Adams's power to re-hypothecate) in any other way or ways than by inspection of the executed notes, they are not chargeable with knowledge of his bad faith. We are of opinion that they were not limited to informing themselves by inspection of the notes, and therefore that they are not chargeable with knowledge of his bad faith.

Where the construction of these ten notes is governed by the law of Massachusetts, and perhaps where it is governed by the law of New York, sales of collateral made by Adams were made without right. So far as Massachusetts is concerned that was decided in *Commonwealth* v. *Althause*, 207 Mass. 32. And sales, if any, made by a co-defendant were wrongful which were not made for default on the part of Adams, under the notes given by Adams for payment of which Adams re-hypothecated the collateral under

the power so to do which he had under the ten notes given him by Heinze. Some of these tortious sales were made by some of the defendants as brokers and some of the securities thus tortiously sold on Adams's orders seem to have been delivered by the defendants, who held them as security for money lent by them to Adams and who received the proceeds of the sales in payment of loans made by them to Adams. The plaintiffs have not sought to charge the defendants who are brokers for sales made by them under the doctrine of *Coles* v. *Clark,* 3 Cush. 399, for injury to the reversionary interest which Heinze had in the securities sold (as to which see *Hodgkins* v. *Bowser,* 195 Mass. 141). Nor have they sought to charge with liability those of the defendants who delivered the securities sold and received the proceeds in payment of Adams's debt to them under the doctrine of *Varney* v. *Curtis,* 213 Mass. 309, and the master has not reported the facts on which the possible liability of the co-defendants on these grounds depends. What the construction of the ten notes is if governed by the law of New York is not altogether plain. As we have said, the only evidence introduced as to the law of New York was *Ogden* v. *Lathrop,* 65 N. Y. 158. If the plaintiffs get leave to amend their bills so as to prosecute the claims which we have just stated, all these questions will have to be tried and decided. At present it is not necessary to consider them.

We have not found anything in the cases cited by the plaintiffs which requires special notice.

In addition to the matters which we have now considered, the plaintiffs have argued twenty-two exceptions to the master's report and an appeal from a refusal of the single justice to recommit the case for further hearing by the master. One of the twenty-two exceptions argued (No. 68) consists of the refusal by the master to give twenty-seven requests for rulings asked for by the plaintiffs, and another (No. 69) is to the adoption by the master of six rulings asked for by the defendant Gove.

We first take up the forty-fifth exception because it is typical of many others. The forty-fifth exception is in these words: "The plaintiffs except to the finding, to the refusal to find, and to the failure to report the evidence set forth in the forty-fifth written objection, — (a) Because the facts requested are material to the issues in the cause and the master has not stated that the same are

not supported by the evidence or given any reason for his refusal to so report: (b) Because the master does not find sufficient facts to warrant the conclusions which he draws, and if his conclusions are founded on other facts, the same should have been reported: (c) Because the evidence requested is necessary to a proper understanding of the rulings." "The evidence set forth in the forty-fifth written objection" was as follows: "His general course of dealing with the defendants after the Heinze loans were made was the same as prior thereto. Adams still advertised in the same manner and with the same frequency; continued to renew loans instead of paying them; continued to pay them in the same manner; continued to give the defendants directions to sell collateral placed with them for the payment of principal and interest; continued to fail to give them his own checks for any substantial sums; he continued to give them checks dated ahead in payment of interest; he continued to swap checks with them; he continued to fail to keep his promises. He received threatening and dunning letters from the defendants. He continued to pay the same rates of interest and commissions.

"Prior to June, 1909, he occupied one small office in the Exchange Building and was neither a member of the Curb or the Boston Exchange.

"Gale and Gould agreed to make a clearance June 9, 1909, which was not carried out. Gould, however, charged Adams $1,000 for the use of $12,500 for a week, although it had not left Gould's possession, and to pay himself $1,000 he later sold one hundred shares of Davis-Daly stock which he held as collateral to the loan, which was not payable and which had been deposited with him by the defendant Adams.

"In May, 1909, for a clearance of $25,000 by Bloom for Adams, Bloom charged him a commission for the use of money for five days of $1,250, or practically four times the usual rate.

"Practically all the sales made by Gale and Gould of the plaintiff's securities were deliveries to brokers. All of the plaintiff's securities which were sold by the defendants Gale and Gould were made through Barnum as their agent and the brokers through whom the sales were made were the defendants Cawley and Gove."

The consolidated cause now before us was referred to the master under a rule which did not secure to the parties a right to have the

master's findings of fact reviewed by the single justice and on appeal by the full court under R. L. c. 159, §§ 19, 24. That is to say, the rule to the master in the case at bar did not direct the master to report, in whole or in part, the evidence on which he made his findings of fact. The rule did direct him to report to the court "so much of the testimony as in his opinion may be necessary to a proper understanding of said [the master's] rulings" of law. That was inserted to enable the parties to have rulings of law made by the master reviewed by the court. The rule to the master in the case at bar was designed to leave and did leave to the final determination of the master the decision of the facts involved in the issues raised by the pleadings. In case of such a reference to a master (unless the cause is recommitted to him for further consideration), the defeated party is limited to arguing, so far as the master's findings of fact are concerned, that on the facts found the final conclusion of fact drawn by the master was wrong. The plaintiffs in these suits, however, have undertaken to have the findings of fact made by the master reviewed by the court. As the foundation for that attempt they filed with the master, before he made his final report, two hundred and fifty-nine requests for findings of fact, and after the draft report was made they filed ninety-nine suggestions for alterations, which, to some extent at least (as was the case of the eighty-third suggestion incorporated in the forty-fifth objection on which the forty-fifth exception now under consideration is founded), included a request for a finding of fact. Having made these requests for findings of fact they now contend that the master must state that the same are not supported by the evidence, or give some reason for his refusal to insert them in his report. It is proper for counsel as part of an argument on facts to submit to a master requests for findings of fact, and a master may in his discretion receive, but he is not bound to receive, such requests for findings. The master's duty is to decide the issues of fact and, under the particular rule of reference made in these suits, to rule on the questions of law on which the merits of the suits depend. The parties have a right to submit to a master requests for rulings of law which are involved in matters which he is to decide, because they have a right to have his findings made under the rulings of law which correctly define the rights of the parties on the issues of fact raised by the pleadings.

But when by the terms of the rule of reference the master is to make a final determination of the facts put in issue in the pleadings, there is no room for filing requests for findings of fact which the master must adopt or give a reason for not adopting. Such a proceeding is putting on trial the master in place of the issues raised by the pleadings. The practice is one which should not be encouraged. Take these suits as an example. It took over a year (from October 26, 1909, to December 20, 1910,) to put in the evidence. The evidence filled seven thousand typewritten pages. How long the master had it under consideration does not appear. But his report was made on May 9, 1912, a year and a half after the evidence was closed. It would be impracticable to try such a cause if (as the plaintiffs have assumed) the master was bound to adopt or give a reason for not adopting each one of the two hundred and fifty-nine requests for findings made by the plaintiffs before the draft report was made and the ninety-nine suggestions for alterations (apparently new requests for findings) made by them after the draft report was submitted to the parties. It is to be remembered that these two hundred and fifty-nine plus ninety-nine are the requests for findings made by the plaintiffs alone, and that there were fourteen defendants who, if the plaintiffs' course of action is justified, had a right to make similar requests for findings which the master was bound to adopt or give a reason for not adopting. It should be added to what has been said already that the requests for findings of fact in these suits and generally are findings in words selected by the plaintiffs on a detached matter which, if adopted, would have to be considered in connection with other findings which would have to be modified if the exact truth were stated.

For the reasons already stated we are of opinion that the forty-fifth exception taken to the master's report must be overruled.

Taking up the other exceptions in their order. The fact that the defendants (who the master found believed that under the form of note here in question Adams had a right to sell the collateral pledged with him) knew that he was selling it, must be taken to have been intended to be found by the master; and the ninth exception must be overruled.

Whether Adams's "appearance of prosperity" corroborated the assurances which he gave to the defendants that he was making

money is a matter which cannot be considered apart from all the circumstances in evidence, and they are not before us. The fifteenth exception must be overruled.

The sixteenth, eighteenth, twenty-first, twenty-seventh, twenty-eighth, thirty-ninth, forty-fourth, fifty-sixth (in part) and fifty-seventh exceptions are disposed of by what we have said as to the forty-fifth; and the seventeenth, twentieth, twenty-fourth twenty-fifth, fifty-sixth (in part) and sixty-fourth, by what has been said as to the fifteenth. As the master ruled on his findings that no defendant but Adams was liable and the plaintiffs disclaimed having an account stated to charge him, the master was right in not stating the account as against Adams, and the sixty-second exception must be overruled.

We proceed to deal with the sixty-eighth exception which is to the refusal of the master to adopt twenty-seven rulings of law asked for by the plaintiffs.

The rulings asked for by the plaintiffs numbered 2–21, inclusive, were not passed upon by the master. If the bill is amended as hereinbefore suggested, it will be necessary to rule on the matters covered by these rulings, and we consider them for that reason. We already have held that the ten notes did not give the holder a right to sell except on default by the maker. But he had a right to re-hypothecate the securities and pledge them alone or *en bloc* mixed with other securities for a new loan made to him. We do not know just what the plaintiffs mean by the proposition that the right of re-hypothecation is such that it must be made "on such terms and conditions and at such rates of interest that the control of it would remain with the first pledgee." Of course the original pledgee who re-hypothecates collateral under this clause has control of the securities no matter what the terms and condition of the re-hypothecation are, and no matter what the rate of interest is. Since his use of the collateral is limited to a re-hypothecation of it, he has control of it because he can redeem the re-hypothecated securities by paying the note for security of which the collateral is re-hypothecated. If by this ruling the plaintiffs mean that one lending to the holder of such a note cannot get rights in the re-hypothecated collateral other than those which the holder had, the ruling is wrong.. The very purpose of inserting in the note this clause (which gives to the holder the right "to make use of the

collateral") is to enable him in re-hypothecating the collateral securities to give to the new pledgee rights in the re-hypothecated securities other than those which his pledgor (the original pledgee) had. Of course the original pledgee, on being paid the note held by him, is bound to return to the original pledgor the original collateral securities or "collateral of the same amount and kind." But that obligation on the part of the original pledgee does not limit the right to re-hypothecate the securities pledged to him which is given to him by the special clause. As it was found by the master that Adams in borrowing money used a form of note which did not contain this clause giving the holder a right to use the collateral, the master seems to have been right in not finding it necessary to give the requests numbered 2–21. But that question may become material before the master on the recommittal of the report. Without doubt the right to make use of the collateral given by this special clause is confined to the original pledgee.

From what has been said in the earlier part of this opinion it is apparent that the plaintiffs were not prejudiced by the master's refusal to give the twenty-second, twenty-fourth, twenty-fifth (without the qualification he added), twenty-sixth, twenty-seventh and twenty-eighth requests for rulings. The thirtieth ruling was not borne out by the evidence.

This brings us to the sixty-ninth exception, which is an exception to six rulings given by the master at the request of the defendant Gove. The first two of these rulings were wrong. The conspiracy charged in the third bill (to which alone the defendant Gove was a party) alleged a conspiracy to which all the co-defendants were parties. If under such a bill a conspiracy between Adams and some one or more of the co-defendants had been proved, the plaintiffs would have been entitled to a decree against Adams and them. The master therefore was wrong in ruling at the request of the defendant Gove that to succeed against any defendant the plaintiffs must prove a fraudulent scheme "in which all the parties defendant were engaged," and that this bill cannot be maintained unless the plaintiffs prove "that the other defendants [meaning the co-defendants other than Gove] corruptly conspired with Adams." It is apparent that the finding of facts made by the master was not affected by these erroneous rulings of law. They

were rulings of law as to the liability of the co-defendants on the findings of fact and not rulings of law which affected those findings. On the findings of the master the co-defendants are not liable for reasons already stated apart from the fact that they were not liable by reason of these erroneous rulings of law. Under these circumstances the plaintiffs are not prejudiced by these rulings of law and the exceptions to the master's report based upon them must be overruled.

The plaintiffs do not now contest the correctness of the tenth, eleventh and twelfth rulings given at the request of Gove unless the defendants were put on inquiry.

The motion to recommit was addressed to the discretion of the single justice. We see no reason for doubting that this discretion was properly exercised by him.

In addition to the ground for holding the co-defendants liable which we already have referred to as not covered by the bill nor by the findings of the master, the plaintiffs on the findings made by the master were entitled to some relief against them. From the master's report it appears that eight of the thirteen co-defendants still hold as security for money lent by them to Adams some of the securities originally pledged by Heinze as collateral for the ten notes or for some of them. Heinze has a right to redeem these securities on which Adams originally had a lien for money lent by him to Heinze and on which (under the findings made in the master's report) these defendants have a lien for money lent by them to Adams. But although there is no express disclaimer on the plaintiffs' part so far as this relief is concerned, there are indications in the master's report that the plaintiffs did not ask for it. Under these circumstances we are of opinion that the decree dismissing the bill as against the co-defendants should not be reversed on this ground unless the plaintiffs ask that that be done.

Some of the defendants have contended that under no circumstances are the plaintiffs entitled to any relief. The defendant Barnum contends that there is a finding of the master which prevents the plaintiffs from maintaining this bill. The master found incidentally that Heinze had caused a fictitious market value to be made for the securities by causing apparent sales to be made by one broker to another, both of whom were acting as his agents. Barnum relies also upon a finding of the master that he (Barnum) and

some other co-defendants were induced to lend money to Adams on Ohio Copper Company bonds on the faith of a telegram sent by Warfield to Adams to be used by Adams in getting money on Ohio Copper Company bonds. This telegram stated that Shoemaker, Bates and Company were ready to buy these bonds at $900 a bond. Shoemaker, Bates and Company were brokers employed by Heinze to give a fictitious value to these bonds, and the fact was that they were ready to buy them for Heinze at that price to sustain the market. Of these facts "Adams and his co-defendants were ignorant." A similar contention is made by the defendants the Shawmut Commercial Paper Company and Demelman. These facts may give rise to a claim for fraud and perhaps for rescission, but in our opinion it is not such a *turpis causa* that the court will refuse to entertain a suit by Heinze or in his behalf.

Nor do these facts prevent the plaintiffs from maintaining this bill on the doctrine that he who seeks equity must do equity as has been contended in behalf of the defense.

The defendants Mason and Potter have contended that on the findings of the master the plaintiffs are estopped from contesting the validity of sales made by Adams. The whole of the finding in this connection is in these words: "Early in January, 1909, and from time to time thereafter, the plaintiff [Heinze] learned that some of the very securities he had pledged with Adams were appearing in the market, and he believed that Adams was selling them. This belief led to the insertion in the note of March 25 of the restriction against selling the collateral hereinbefore referred to, and the clause in Adams's receipt of April 5, binding him to return the identical certificates pledged to secure Joyce's note of that date. During this time Adams was selling the plaintiff's collateral as occasion required, although he denied it when from time to time accused of so doing by the plaintiff [Heinze] or his associates, and at all times did what he could to prevent the knowledge of it from reaching them." Clearly no estoppel on the part of Heinze arises as against unknown persons to whom Adams under these circumstances was wrongfully selling these securities.

Unless the plaintiffs within ninety days from the date of the rescript in this case file in the clerk's office of the Supreme Judicial Court for the county of Suffolk a statement in writing that they

wish to redeem the bonds now held by some of the co-defendants, or unless within said ninety days they shall obtain leave to amend their bills of complaint in the way already indicated, the decree appealed from is affirmed with costs. If within said ninety days such a statement in writing is filed, or if such an amendment is allowed, the decree dismissing the bill as against the co-defendants in question or all of it is to be reversed and the cause is to stand for hearing for one.or the other, or for both purposes; and it is

*So ordered.*

*C. M. Wood & W. I. Badger,* (*W. H. Hitchcock* with him,) for the plaintiffs.

*B. B. Jones,* for the defendant Gale.

*H. F. Hurlburt, Jr.,* for the defendant Barnum.

*D. E. Gould, pro se.*

*E. M. Schwarzenberg,* for the defendants Shawmut Commercial Paper Company and Demelman.

*H. H. Bond,* for the defendants Mason and Potter.

*A. K. Cohen & H. A. Mintz,* for the defendant Bloom, submitted a brief.

*C. W. Rowley,* for the defendant Adams, submitted a brief.