## JAMES B. CORSTORPHINE *v.* BISHOP NATIONAL BANK OF HAWAII AT HONOLULU.

### No. 2112.

ARGUED NOVEMBER 2, 8, 1934.       DECIDED FEBRUARY 20, 1935.

COKE, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY COKE, C. J.

(Parsons, J., dissenting.)

The partnership firm of Williamson & Buttolph, for a long period of time prior and up to about June 8, 1932, was engaged in conducting a general stock brokerage business in the Territory of Hawaii, with headquarters at Honolulu. In 1924, or 1925, the plaintiff in error, James B. Corstorphine, assistant cashier of the Lihue branch of the Bank of Hawaii, opened an account with the broker which, from time to time, purchased and sold securities on the New York stock exchange through its New York correspondent for the account of Corstorphine and other

customers. These transactions continued up to a short time prior to June 8, 1932, at which latter date the brokerage firm became insolvent and its surviving member, Mr. Buttolph, quitted the Territory and the firm ceased business activities. Corstorphine's margin trading account with his broker, which appears to have fluctuated from time to time, was secured by certificates of stock held in the name of Corstorphine and endorsed in blank by him and delivered to his broker. It appears also that he executed notes to the broker in the amount of his indebtedness. These notes and securities, together with those of other customers, were from time to time pledged with the Bishop First National Bank of Honolulu, the defendant herein, as security for loans which the broker required in the conduct of its business. In the earlier transactions between the bank and the broker it was the practice for the broker, when desiring a loan, to pledge with the bank its customers' promissory notes and securities which in the manner above described had been placed with the broker by its customers including plaintiff in error. These documents were rehypothecated with the bank under the broker's general collateral pledge. In April, 1930, this practice being unsatisfactory to the bank, a new basis of conducting business between the broker and the bank was adopted. Under the new arrangement the bank no longer took over the notes of the broker's customers nor accepted certificates of stock merely endorsed in blank but required the broker in all cases to obtain from its customers written authorization to hypothecate the stock, otherwise it would not be accepted by the bank as collateral. The bank officials then prepared a form of document to be used by the broker to effectuate the plan above outlined. The document as drafted and thereafter used by the broker was in the following language:

318

"......................................................... 19......

"I hereby authorize Willamson & Buttolph, of Honolulu, T. H. to hypothecate the following securities:

Certificate No.............. for................. shares of.............

Certificate No.............. for................. shares of.............

Certificate No.....:....... for................. shares of.............

Certificate No.............. for................. shares of.............

with any Bank or banker.

"Signature............................................."

This authorization, duly executed by the owner of the securities, was uniformly required by the bank after April 1, 1930, in all cases where the broker applied to the bank for loans and tendered its customers' certificates of stock as collateral to secure the general account of the broker with the bank. Among the securities delivered by the broker to the bank to protect its indebtedness to the bank were 30 shares of the capital stock of the Oahu Railway & Land Company, Limited, an Hawaiian corporation; 50 shares of the capital stock of the Bishop Trust Company, Limited, an Hawaiian corporation, and 14 shares of the capital stock of the Bank of Hawaii, an Hawaiian corporation, all standing in the name of Corstorphine and all of which were endorsed in blank by him and, accompanied by the card of authorization above described, duly executed by him. The first of these hypothecations, all of which are involved in this controversy, was made in June, 1930, and the last, being that of 11 shares of the stock of the Bank of Hawaii, in April, 1932, some time prior to the insolvency of the brokerage firm. At that period the indebtedness of Corstorphine to the broker was $1500, the indebtedness of the broker to the bank was in the neighborhood of $160,000 and the value of the stock in question was approximately $5500. Shortly after the insolvency of the brokerage firm Corstorphine, by his attorney, tendered to the bank the

amount of Corstorphine's indebtedness to the broker, namely, $1500, and demanded delivery of the certificates of stock formerly owned by him. The tender and demand were refused, the bank officials asserting that these securities, as well as all others pledged with the bank under similar circumstances, would be retained by it as security for the payment of the total indebtedness of Williamson & Buttolph to the bank. Corstorphine, in the latter part of December, 1932, instituted in the circuit court of the first judicial circuit an action in trover against the defendant in error for recovery of judgment in the sum of $9000, the same being the alleged value of the stock at that time, including dividends paid thereon alleged to have been wrongfully collected by the bank.

The cause was heard before the circuit court with the aid of a jury and at the conclusion of the introduction of evidence and on motion of the defendant's counsel the court directed a verdict against the plaintiff who now brings the cause to this court on a writ of error, seeking reversal of the judgment entered in the court below.

The plaintiff in error assigned some twenty separate specifications of error as ground for his attack upon the judgment of the court below. His counsel, however, in their brief summarized the questions as follows: "First: Did the trial court err in ruling as a matter of law, that the defendant, at the time of the repledge by Williamson & Buttolph of the plaintiff's securities, had no notice, actual or constructive, of the ownership of the plaintiff in the stock? Second: Did the trial court err in ruling that Buttolph, by virtue of the hypothecation card, was authorized to repledge plaintiff's stocks for Buttolph's own purposes and to secure the general indebtedness of Buttolph to the defendant? Third: Did the legal title to the securities in question pass by endorsement and delivery to the defendant bank without the necessity of a transfer on

the books of the corporation?" In granting the motion for a directed verdict the trial court, after resolving all of the evidence in favor of plaintiff, held that a verdict for plaintiff could not as a matter of law be sustained and therefore ordered the jury to find for defendant. The court specifically found that under the law the card of authorization above described and executed by plaintiff conferred upon the broker unrestricted and unlimited power to pledge plaintiff's stock as collateral for the security of the payment of the broker's account with the bank regardless of the amount involved. The following excerpts from the decision of the trial judge will indicate clearly the basis of the decision now under attack: "The evidence shows that prior to the early part of 1930 the trading business of Williamson & Buttolph secured financial backing from the Bank of Bishop & Company by simply pledging their own and clients' stock endorsed in blank accompanied by clients' notes; and in that connection, the court will assume that the evidence is sufficient on behalf of the plaintiff to show that amongst the stock in the hands of Bishop & Company when the system was changed in the early part of 1930, amongst those stocks deposited against the general credit and securing the general credit of Williamson & Buttolph with the bank, were plaintiff's stock certificates." The court then referred to the change in the method of doing business with the bank and pointed out that under section 3346, R. L. 1925, and the early decisions of the supreme court of Hawaii as between parties dealing with stock certificates, the legal title passes by endorsement and delivery of the certificate, but the court clearly indicated that its decision was based upon the authorization contained in the hypothecation card rather than upon any rights to hypothecate which may have been conferred upon the broker by virtue of any authority under the statute mentioned. As already indi-

cated the first hypothecation card was executed by plaintiff on June 30, 1930, and was for fifty shares of Bishop Trust Company, Limited. The court then proceeded in its decision to say: "The facts are that on May 26, 1931, another authorization to hypothecate is indicated in the evidence, with another certificate of stock,—this one being for thirty shares of Oahu Railway & Land Company,—indicating that this certificate was in the hands of Williamson & Buttolph and the authority to hypothecate was indentified and admitted by the plaintiff. On October 13, 1931, a third certificate, Bank of Hawaii, Limited, for three shares, is shown by hypothecation agreement in evidence to have been pledged, which is evidence to indicate that Williamson & Buttolph had plaintiff's certificate endorsed in blank and the certificate itself is also evidence corroborating the fact. On April 9, 1932, a certificate for eleven shares of Bank of Hawaii was either at that time or had been in the hands of Williamson & Buttolph and at that time a hypothecation authorization was signed by the plaintiff. Now, we have stock certificates endorsed in blank in the hands of Williamson & Buttolph,—Mr. Buttolph, for the purpose of record, being the stock broker. We have a situation where the bank, in the early part of 1930, by the evidence in the case, refuses to carry on that account in the old manner; what the reasons were for the bank requiring such a change of custom is immaterial. * * * A man or a corporation standing in the position of the bank, loaning the borrower money, has a right to nominate its own terms at which that money shall be loaned. * * * I do not want anything to be said that the court is overlooking the fact that the form was dictated by the bank; and I say in that connection that the bank had a perfect right to dictate upon what terms it would further do business on credit accounts with a stock broker and with that stock broker in particular. The facts in the case show that upon such

notice to the stock broker and upon being furnished with such form he had the form printed for use in his business so that he could carry on the trading account of the stock broker. Whether or not the stock broker induced his customers to sign such a form by means of a fraudulent misrepresentation of the truth or whether he furnished such client with a legal opinion or whether such client went to others for a legal opinion is immaterial. The only question that is material is: what is that form; what does it mean? Upon that point, it is the duty of the court to construe it; and it is not a question of fact that can be left to a jury." After referring to the language in the card of authorization, the decision proceeds: "That language is simple; that language is direct and the language is unambiguous. * * * It does not say 'I hereby authorize Williamson & Buttolph of Honolulu, T. H. to hypothecate the following securities for my account.' * * * It simply says in general, unlimited language: 'I hereby authorize Williamson & Buttolph of Honolulu, T. H. to hypothecate the following securities,' naming them. * * * When the plaintiff puts this kind of authority in the hands of his broker, thereby inducing the banker to loan money thereon, with the bank's reliance on the statement that 'I, the plaintiff, have confidence in my broker to the extent that I have put in his hands certificates endorsed in blank and that he could hypothecate those certificates or sell them and the bank would be clear but the broker would be responsible to me. I also have confidence in him to the extent that he could hypothecate with any bank or banker and no questions would be asked.' If the plaintiff has not any confidence in his broker,—if he doesn't want to speculate in the stock market in the way banks approve,—if he doesn't want to add that in the business,—he doesn't have to. He can go to his own bank if he wants to do business direct with the broker. But if he gives him legal title and gives

him fluctuating authority to hypothecate, with no restrictions, who is he to talk when he finds that others have been led into lending cash on the basis of his own authority and say that the authority indicates that there is a doubtful situation as to the good faith of the bank who furnishes the broker with assets or on the part of the customer who furnishes the broker with the means to get the cash. Frankly, I am unable to understand how the dictation of this authority as shown by the evidence to be the dictation of the bank,—how that indicates lack of good faith on the part of the banker. It certainly is English. It certainly has a definite understandable meaning and it certainly has no limitation. * * * This is a lawsuit in which the bank is charged with conversion. You have to show that the bank acted without authority in taking the property of another. * * * If, by the rise and fall of the market the bank wants to be paid and the broker is insolvent, as the stock broker in this case is, upon whom should the loss fall? * * * There being no evidence in this case of fraud on the part of the broker and the plaintiff; there being no evidence of fraud between the two called to the attention of the bank at the time the stock was pledged but on the contrary the evidence being clear and unequivocal that the bank was furnished with stock properly endorsed, with the authority in the broker to hypothecate * * * ; there being no evidence that the money loaned by the banker was for another purpose than the business that the broker was carrying on as a broker between others in the plaintiff's position on the stock market,—nothing in the case to indicate that the broker was defrauding anyone. It is shown in this case that the broker was a man of integrity as far as his personal conduct and business conduct was concerned. Under those circumstances, no conversion is shown."

With these conclusions of the trial judge we are in ac-

cord.   As we view it the controlling issue in this appeal is confined to the determination of the purpose and effect of the authorization card above set out.   Are its terms unambiguous and clear in their meaning and did it authorize the broker to pledge the stock certificates of plaintiff in error as security for the payment of the broker's account with the bank as claimed by defendant?   Did it confer upon the broker an unrestricted and unlimited control and dominion over the securities, empowering it to pledge the stock with any bank or banker?   Or was the authority, as urged by plaintiff, confined to the right in the broker to merely pledge them to guarantee the payment of only such sum as Corstorphine might at the time have been indebted to it?   Counsel for plaintiff concedes that even in the absence of the card of authorization the broker possessed the right to hypothecate the stock with the bank to the extent of the debt owing the broker on the customer's margin trading account and advances the theory that the only additional power conferred upon the broker by the card which the broker did not already possess was the authority to commingle the customer's stock with that of other customers and to pledge the entire holding "en bloc" as security for the broker's accounts with its bank.   No such limitation is expressed in or may be inferred from the contents of the document.   No attempt was made by plaintiff to impeach the document and in our opinion its terms are unambiguous and its meaning clear.   In other words, the document speaks for itself and plainly authorizes the broker to pledge the stock as security for the payment of the broker's obligation to the bank or for any other purpose or any other account which the broker, in the exercise of its discretionary power, might choose.   No restrictions or limitations whatever were imposed by the document upon the broker save the one restriction requiring that the subpledgee be a bank or banker.   For general rules of con-

struction applicable in the present case see 1 Restatement of Law of Agency (Am. Law Inst. 1933), §§ 26, 27, 33, 34 and 35.

The Law of Stockbrokers and Stock Exchanges by Meyer, pp. 331, 332, clearly points out that a stockbroker may not without special authorization hypothecate his customer's collateral beyond the amount of the broker's interest therein, that is to say, the amount which the customer owes the broker thereon, but of course the customer may, by special agreement, confer upon the broker authority to hypothecate the customer's stock without limitation. This author says at page 331, § 69: "When a broker purchases securities for a customer on margin he is usually required to advance the greater portion of the purchase price. Obviously active brokers have insufficient resources of their own to carry all of the marginal commitments of all of their customers, and they therefore find it necessary to become borrowers themselves. In borrowing from their banks or from other brokerage houses they, in turn, must also give security, and as they cannot be expected to have sufficient stocks or bonds of their own for that purpose, they must necessarily use those of their customers. This is the usual practice of stockbrokers and is permitted within limitations defined by law or by agreement between the broker and the customer. The broker has the right, as a matter of law, to rehypothecate his customer's securities for an amount not in excess of the customer's indebtedness against such securities. This right exists with respect to securities which the broker has purchased for the customer on margin, as well as with respect to securities which were initially deposited by the customer as margin. In the absence of an agreement permitting him to do so, the broker may not repledge his customer's securities for an amount in excess of the customer's indebtedness to him unless he does so under an arrangement permitting the withdrawal

of the securities from his own pledgee on payment of an amount equal to the customer's indebtedness. However, it is customary for brokers to obtain special agreements from customers who desire to open marginal accounts authorizing the broker to repledge the customer's securities without limitation, and such agreements are recognized as valid."

The doctrine thus announced by Meyer has the approval of an overwhelming preponderance of authority both federal and state (*Matthews* v. *Warner,* 145 U. S. 475; *Wright* v. *Blank,* 20 Fed. [2d] 591; *Wolf* v. *American Trust & Savings Bank,* 214 Fed. 761; *In re Toole,* 274 Fed. 337; *Bartlett* v. *Calvert Bank,* 91 Atl. 549; *Ogden* v. *Lathrop,* 65 N. Y. 158; *Unangst* v. *Roe,* 107 Misc. Rep. [N. Y.] 516). It is settled law that a broker may without special authorization hypothecate his customer's collateral to the extent of the broker's interest therein but if he proposes to hypothecate his customer's collateral for any amount beyond such interest he must first have proper authorization from his customer to do so. The decision of the circuit court of appeals, ninth circuit, in the case of *Wright* v. *Blank, supra,* appears to go further than the rule above stated and even beyond the doctrine contended for by the defendant in error in the present case. In the *Wright* v. *Blank* decision the court said (p. 592) : "He" (customer) "concedes that the bonds had been held by them" (brokers) "since 1921 as security to cover any indebtedness to them which he might incur by reason of cash borrowed, or an unpaid balance on the purchase price of additional securities. He doubtless knew they were transacting business for himself and other customers through Houseman & Co., and must have realized that to get funds or credit they would have to hypothecate the securities of their customers deposited with them to cover trading accounts. As we have seen, the margin of his securities sold over his

indebtedness was not unreasonably great. Such being the circumstances, the established rule seems to be that, in the absence of an understanding to the contrary, there is an implied authority in the broker to hypothecate." In the present case the stock certificates were not only endorsed in blank by the plaintiff in error but he executed a document which clothed the broker with unlimited and unrestricted authority to pledge them to any bank or banker.

In *Unangst* v. *Roe, supra,* a case where the brokers' customer was the defendant in an action brought to secure an accounting from him in regard to surplus of collateral delivered to him and discussing the question now under consideration the court said (p. 522) : "He" (the customer) "had, however, given the brokers authority to pledge these securities with the banks and while the brokers might be under a contractual obligation to return the securities to him on demand, such a demand, even if peremptory and for immediate delivery, could not revoke *ab initio* the authority previously given or make tortious an act performed with the defendant's consent. The right of the lender to look to this collateral became fixed when the pledge was made. These rights were given to it by Roe's" (the defendant's) "authority and neither Roe nor the brokers could change these rights without the lender's consent. The payment of the debit balance to the brokers freed the securities from the lien of the brokers but did not free them from the lien of the banks to which they had been pledged."

Counsel for plaintiff in error refer us to a large number of cases which they argue support their position. One of the leading cases relied upon by them is *Warfield* v. *Adams,* 102 N. E. 706. We quote from the syllabus: "A pledgee, in the absence of a special agreement, is bound to hold the collateral pledged as security for the debt for which it has been pledged, so that the pledgor can redeem the property

at any time by paying the debt for which it is security, and has no right to separate the collateral from the debt and to rehypothecate it for a new loan made to him by a third person." No fault can be found with the doctrine thus announced but in the *Warfield* v. *Adams* case no special agreement to rehypothecate without limitation existed while in the present case such an agreement did exist and under its authority the stock of plaintiff in error was pledged with the bank.

The construction of the document was for the trial court (see 1 Mechem on Agency, 2d. Ed., §765) and the construction placed thereon by the court conforms to the clear import of the language employed.

It appears from the record in this case that the broker from time to time required advances of substantial sums of money to finance its brokerage business including the carrying of its customers' margin accounts among which was that of the plaintiff in error. The Bishop First National Bank, the defendant in error, was resorted to for the financial assistance required. The amount involved was large and the bank as a matter of business precaution refused to accept as collateral the mere notes and endorsed certificates of stock of the broker's customers, which had been the former practice, and insisted that the customers' certificates of stock in addition to being endorsed in blank be also accompanied by a written authorization duly executed by the owner, empowering the broker to rehypothecate the stock to protect the broker's account. This attitude of the bank was sound banking practice and was neither oppressive nor unjust to any of the parties concerned. When plaintiff in error signed the card of authorization he was *sui juris* a business man and a banker. He must have been fully cognizant of the fact that the card did more than permit the broker to rehypothecate merely to the extent of his indebtedness to his broker—a right

which the broker possessed without such card—he is presumed to have known that he was conferring upon his broker the right to hypothecate the stock without restrictions or limitation. He is presumed not only to have known the contents of the document but to have contemplated the risk which he was assuming when he granted his broker the right to rehypothecate his stock. However, if he elected to indulge in hazardous speculation on the New York stock exchange that was his privilege. If he chose to jeopardize his property to aid his broker he was free to do so. In the light of subsequent events he acted unwisely but now that a loss has been sustained by reason of circumstances which he himself created should he be permitted to shift the burden of the disaster from his own to the shoulders of others? Counsel for plaintiff in error argue that if the intention was to permit unrestricted rehypothecation that intention should have been expressly stated in the document. The answer is, had the plaintiff in error desired to restrict or limit the authorization to rehypothecate that purpose should have been set forth in the document.

A party dealing in good faith with another and in reliance upon the terms of a complete and unambiguous written document cannot be bound by restrictions or limitations not contained in the document and of which he has no knowledge. Upon receiving from the broker the authorization executed by plaintiff in error, together with the certificates of stock endorsed in blank by him, the bank was justified in believing and apparently did believe that the document meant what it said and acting upon this belief advanced to the broker at different times large sums of money. Later on the brokerage firm became insolvent. A loss had been sustained but to require the bank, which advanced its funds upon the faith and credit of the document of plaintiff in error, to sustain the loss would be to inflict an injustice which we are unwilling to sanction.

Plaintiff in error attempts to invoke the rule to the effect that the authority of an agent terminates or is suspended when the agent has notice of the happening of an event or a change in conditions from which he should reasonably infer that the principal does not consent to the further exercise of the authority or would not consent if he knew the facts. See Restatement of Law of Agency (Am. Law Inst.), *supra,* § 108, and § 113, which provides that "the bankruptcy or insolvency of an agent terminates his authority to conduct transactions in which the state of his credit would so affect the interests of the principal that the agent should infer that the principal if he knew the facts would not consent to the further exercise of the authority." This rule might be applicable here if the broker in dealing with the bank was acting as the agent of its customer, the plaintiff in error, and the broker was bankrupt or insolvent at the time and the bank knew or was charged with knowledge of such bankruptcy or state of insolvency. "In exercising his ordinary functions in marginal transactions, therefore, the broker acquires, so to speak, a dual personality. When he executes the order he is the customer's agent, buying from or selling to a third party. When he provides funds to complete the order and to carry the securities purchased, he deals with his customer as a principal, advancing his own money and retaining the customer's property as security, with all the rights and obligations which attach to an ordinary loan of money on the security of personal property." See Meyer, The Law of Stockbrokers and Stock Exchanges, pp. 254-255. But even were it proper to hold that the broker in rehypothecating the stock in question for the purpose of securing financial assistance from the bank was acting as the agent of plaintiff in error, yet the evidence in the case totally fails to establish the bankruptcy or insolvency of the broker at any of the several dates

when the stock was pledged with the bank. The most that can be said is that the broker's account with the bank was under scrutiny by the bank's officials and the broker was in quest of financial assistance—a condition which we venture to suggest was parallel to that of a vast majority of brokerage firms throughout the country in the month of April, 1932, but one which falls far short of insolvency or from which insolvency could be inferred. Insolvency denotes a condition in which a person has not sufficient assets to pay his debts. "As the term is ordinarily used, it is not the same thing as a mere failure to pay debts, but, in the case of an individual or corporation, it means an insufficiency of property and assets to pay debts." *San Antonio Hardware Co.* v. *Sanger,* 151 S. W. 1104-1107. The insolvency of the brokerage firm of Williamson & Buttolph did not occur until June 8, 1932,—the lapse of more than a month after the last of plaintiff in error's stock had been pledged. It is a well-known fact that one whose property values depend upon the erratic fluctuations of the stock market may overnight be reduced from a state of affluence to one of poverty.

The existence or nonexistence of authority may under certain circumstances become a question of fact for the jury but in the present case we are not dealing with implied authority but with express written authorization which clearly and without ambiguity conferred upon the broker the power to perform acts which it did perform strictly within the scope of the authorization.

Where a principal confers, in writing, upon his agent the power to do certain acts he is presumed to have put into the express power all the limitations he cares to have made public and third persons are not bound to look beyond such power for other restrictions on the agent's authority. (See 31 Cyc. 1336; *King* v. *Mellon Nat. Bank,* 75 Atl. 832; *Shattuck* v. *American Cement Co.,* 54 Atl.

785.) This presumption ought to apply with even greater force where the relationship of principal and agent does not exist.

The defendant in error has committed no wrongful conversion of any securities owned by plaintiff in error and it follows that the latter cannot recover in trover against the bank. We have considered all of the assignments of error and find them without merit. The judgment of the lower court is affirmed.

*J. G. Anthony* (*Robertson & Castle* on the briefs) for plaintiff in error.

*J. R. Cades* (*Smith, Wild, Beebe & Cades* on the briefs) for defendant in error.

### DISSENTING OPINION OF PARSONS, J.

I cannot agree that the hypothecation card (the form of which is quoted at length in the majority opinion) is capable of interpretation in all its essentials as applied to this case as though it presented only a pure question of law; and I dissent from the view that its provisions may be construed as a matter of law by the court as an unlimited authorization to Williamson & Buttolph or either of them to hypothecate with any bank or banker the signer's certificates therein named as security for Williamson & Buttolph's firm or individual indebtedness to the bank.

Standing alone a signed authorization to Williamson & Buttolph to hypothecate certain named securities with any bank or banker is at most but a power of attorney. It conveys no title in the securities named to the donee of the power; and the authorization, in the view herein expressed, must be interpreted to be an authorization to the donee to act for the donor and for his benefit. Thus it has been held that a power of attorney authorizing the donee to sell, convey, mortgage and hypothecate property of the donor upon such terms and conditions and under such con-

veyances as the donee shall think fit, does not authorize a gift of the subject matter or a conveyance of the same without consideration. See *Brown* v. *Laird* (Ore.), 291 Pac. 352, 73 A. L. R. 877; *Hanrick* v. *Patrick*, 119 U. S. 156. It has further been held that an attorney in fact acting under a power of attorney for the sale of corporation stock has no authority to sell the stock in part or in full payment and satisfaction of his individual indebtedness without the knowledge, precedent authority or subsequent ratification of his principal. See *Wilson* v. *Wilson-Rogers*, 181 Pa. 80, 37 Atl. 117, cited in the case notes of 73 A. L. R. 891. To the same effect are *Hewes* v. *Doddridge*, 1 Rob. (Va.) 143, and *Frink* v. *Roe*, 70 Cal. 296, 11 Pac. 820, cited in the same case notes.

In construing a power of attorney the intention of the donor is said to be the controlling factor. If the language of the instrument itself does not clearly and without ambiguity express that intention, and extrinsic evidence is necessary and proper in the premises, then questions of fact presented by such evidence are for the jury to determine under proper instructions. "When a written instrument cannot be construed without the aid of parol evidence or the reference to facts outside the writing itself or when its construction involves questions of fact, the instrument should be submitted to the jury rather than to the judge to find the facts." Jones, Ev., Civ. Cas. (3d Ed.), § 175, p. 235. In the instant case extrinsic evidence was introduced to show that Williamson & Buttolph were stockbrokers; that they or one of them had been employed for many years past to purchase mainland stocks on margin for plaintiff's account; that prior to June, 1930, they, and after Mr. Williamson's death in November, 1928, the survivor, Mr. Buttolph, had taken plaintiff's notes for his balances secured by pledges of his Hawaiian stocks owned wholly by him; that such notes and stocks had been re-

pledged by Williamson & Buttolph or G. H. Buttolph to the bank on account of their or his own indebtedness to the bank, and had been entered in the books, receipts and accounts of the bank with notations under a key system of identification; that at some time prior to June 30, 1930, a new system was inaugurated by the bank whereby the original pledgors' notes were returned to the brokers and hypothecation cards in the language quoted in the majority opinion were substituted therefor; that the card forms, dictated by an officer of the bank, were prepared and sent by the brokers to their customers and were returned by the latter to the brokers executed as herein shown, and were then sent by the brokers to the bank; that under this system the plaintiff executed and delivered four cards dated respectively June 30, 1930, May 26, 1931, October 13, 1931, and April 9, 1932, for the following named stocks respectively: Certificate B346 for 50 shares Bishop Trust Company, Limited; certificate 1728 for 30 shares Oahu Railway & Land Company; certificate 998 for 3 shares The Bank of Hawaii, Limited, and certificate 1097 for 11 shares Bank of Hawaii. According to the evidence these shares were then pledged to the bank as security for Williamson & Buttolph's or Buttolph's general account. Mainland securities theretofore purchased by Williamson & Buttolph for plaintiff's account were sold by the brokers and the proceeds credited to plaintiff's account on June 4, 1932. On June 8, 1932, Mr. Buttolph left the Territory. At that time the indebtedness of plaintiff to Williamson & Buttolph, or Buttolph, was approximately $1500. The value of his Hawaiian securities pledged as aforesaid was then in excess of $5500. The general indebtedness of Williamson & Buttolph, or Buttolph, to the bank then amounted approximately to $160,000. Thereafter, in June or July, 1932, the plaintiff learned for the first time that his stocks had been repledged by Williamson & Buttolph, or But-

tolph, with the defendant bank which had transferred the same to its own name. Thereupon plaintiff offered to pay the full amount of his indebtedness to Williamson & Buttolph, together with interest thereon to the defendant bank, which offer was refused by the latter's manager, who asserted that the bank had the right to hold said securities for said general indebtedness of Williamson & Buttolph. Thereafter certain of said stocks were sold by the bank and the proceeds applied to the brokers' general account. The rest are still held by the bank on said account. This evidence was considered by the circuit judge. Much of it was recited in the oral opinion upon which his order for a directed verdict was based. Thus considered, in this minority view, it does not aid the construction which the court placed upon the written instrument.

There are, however, cogent reasons why the evidence should not have been taken from the jury. In the view that the instrument operated neither as a transfer of title nor as an unlimited power to hypothecate the stocks for the benefit of the donee there remained to be considered the question of apparent authority. The brokers had been pledgees of the plaintiff's Hawaiian stocks without the additional interest in them that a broker is said to have in stocks purchased and held by him for a customer through the use of the broker's own cash or credit. The Hawaiian stocks before being pledged were the exclusive property of the customer and were pledged by him to secure his notes or account as in any ordinary case. The endorsement in blank of the customer's stocks and the delivery of them to the broker did not release or convey the customer's equities therein. He still had a right to redeem his stocks by paying his indebtedness to the pledgee. And the pledgee's interest in said stock was all that the pledgee acting for himself could legally hypothecate. Quoting from the syllabus of *Okada* v. *Akahoshi,* 29 Haw. 719, 720: "Knowl-

edge that stock is the property of the pledgor and that it is in the hands of the pledgee as collateral security for a loan is sufficient to put a purchaser upon inquiry and to charge him with notice of the amount of said loan, the payments made thereon and the conditions upon which said stock may be redeemed." The same rule of notice applies to a sub-pledgee of such stock as to a purchaser; and a sub-pledgee with notice, actual or constructive, of a pledgor's equities takes no better title than that of the original pledgee. There was evidence of facts showing defendant's knowledge of plaintiff's ownership of the Hawaiian stocks herein described and that they were held by the brokers as collateral only. I refer to evidence of plaintiff's notes in the first instance, to the recitals in the certificates of stock, and to the hypothecation cards themselves and to the identifying notations in the bank's receipts, books and accounts as above narrated. Evidence of facts showing knowledge or notice is peculiarly within the province of the jury to consider. Two assignments of error were based upon the court's refusal to submit such evidence to the jury for findings of fact in connection with the questions of actual and constructive notice in the premises. In this minority opinion they are both well taken.

For the reasons above set forth I think that the judgment of the trial court should be reversed.